## Commonwealth *vs.* Weston W., a juvenile (and a companion case[1]).

Middlesex. April 6, 2009. - September 25, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Minor,* Curfew. *Constitutional Law,* Equal protection of laws, Right to travel, Privileges and immunities, Commerce clause, Freedom of movement. *Municipal Corporations,* By-laws and ordinances.

This court concluded that the strict scrutiny standard was the appropriate standard of review to employ in considering an equal protection challenge to a juvenile curfew ordinance, where the curfew represented a particularly sweeping restriction on the juveniles' fully-formed right to move freely within the Commonwealth, as guaranteed by the Massachusetts Declaration of Rights. [30-35] Spina, J., concurring.

This court, in considering whether a city ordinance imposing a curfew on persons under the age of seventeen (juveniles) violated the equal protection rights of the juveniles under the Massachusetts Declaration of Rights, concluded that the curfew itself, which subjected the juveniles to a restriction on their rights to movement and to travel that persons seventeen and older did not have to endure, was narrowly tailored to achieve the government's compelling interest in protecting minors, in preventing crime, and in promoting parental supervision and authority over minors [35-37], and the ordinance's civil enforcement mechanism was reasonable, balanced, and narrowly tailored [37-38]; however, the criminal processes and punishments provided in the ordinance for curfew violations were not the least restrictive means of accomplishing those purposes and contradicted well-established goals of rehabilitating, not incarcerating, juvenile offenders [39-41]. Spina, J., concurring.

Complaints received and sworn to in the Middlesex County Division of the Juvenile Court Department on September 21 and October 12, 2004.

Questions of law were reported to the Appeals Court by *Jay D. Blitzman,* J.

The Supreme Judicial Court granted an application for direct appellate review.

[1]Commonwealth *vs.* Adam A., a juvenile. Both names are pseudonyms. According to the Commonwealth, at a motion hearing on January 17, 2006, the Juvenile Court judge consolidated the cases.

*James L. Sultan* (*Jonathan P. Harwell & Anna Eliot* with him) for the juveniles.

*Miriam S. Pappas*, Assistant District Attorney (*Loretta M. Lillios*, Assistant District Attorney, with her) for the Commonwealth.

The following submitted briefs for amici curiae:

*Laura Rotolo* for American Civil Liberties Union of Massachusetts.

*Brian W. Leahey*, Assistant City Solicitor, for city of Lowell.

*Cecilia Chen, Barbara Kaban, Francine Sherman, Joshua Dohan, Leah Rabinowitz, Ashley Lewis, & Nicole Dooley* for Asian American Legal Defense and Education Fund & others.

*Michael Adam Burger* for David Ahl & another.

CORDY, J. Around midnight on different dates, police officers in the city of Lowell (Lowell) encountered the juvenile defendants outside on the street. Each juvenile was arrested and charged with violating Lowell's "Youth Protection Curfew for Minors" (ordinance), which requires persons under the age of seventeen (minors) to be at home between 11 P.M. and 5 A.M. unless they meet one of a number of exceptions. The juvenile defendants filed motions to dismiss the complaints, arguing that the ordinance infringed on rights guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and art. 12 of the Massachusetts Declaration of Rights. In a memorandum and report prepared pursuant to Mass. R. Crim. P. 34, as amended, 442 Mass. 1501 (2004), a judge in the Juvenile Court Department reported the following questions of law to the Appeals Court:

> "1. Does the Lowell Youth Protection Curfew for Minors violate the equal protection rights of the Juveniles under either the United States Constitution or the Massachusetts Declaration of Rights by subjecting the Juveniles to a restriction upon their rights to movement and travel that persons seventeen and older do not have to endure?

> "2. What is the appropriate standard of review in considering an equal protection challenge to a juvenile curfew ordinance in this Commonwealth?"

We granted the juveniles' application for direct appellate review. We conclude that the Lowell ordinance implicates, and the Declaration of Rights protects, a fundamental right of free movement.[2] Therefore, the "strict scrutiny" standard of review applies, and the Commonwealth has the burden of demonstrating that the ordinance is narrowly tailored to achieve a compelling government interest. *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 330 (2003) (*Goodridge*). The juveniles concede that the government has a compelling interest in protecting minors, in preventing crime, and in promoting parental supervision and authority over minors. The remaining constitutional question, then, is whether the ordinance is narrowly tailored.

We conclude that the curfew itself is narrowly tailored to achieve its purposes. However, the criminal processes and punishments provided in the ordinance for curfew violations are not the least restrictive means of accomplishing those purposes, and contradict well-established goals of rehabilitating, not incarcerating, juvenile offenders. Consequently, they are not sufficiently tailored to meet the strict scrutiny standard. See *Commonwealth* v. *Florence F.*, 429 Mass. 523, 526-527 (1999). We also conclude, however, that the civil enforcement provisions of the ordinance are sufficiently less restrictive to survive constitutional scrutiny.

1. *Background.* A Lowell police officer approached Weston W. outside at 12:15 A.M. on September 21, 2004. Weston informed the arresting officer that he had no identification, that he was sixteen years old, and that he lived in Somerville. He also stated that he was attempting to visit a girl who lived in Lowell. The officer placed him under arrest for violating the ordinance and transported him to the police station.

At 12:27 A.M. on October 10, 2004, responding to a report of a disturbance, officers observed a group of young people, and as the officers approached, members of the group began to flee. The officers apprehended some of the group, including Adam A., and determined that they were minors. They were similarly arrested for violating the ordinance and transported to the police station.

The parties have stipulated that the ordinance was applied criminally to both of the minors. In response to the juveniles'

[2]We therefore do not consider the defendants' claims under the United States Constitution.

motions to dismiss the complaints, the judge initially held that the ordinance's criminal sanctions were unconstitutional. He subsequently stayed the dismissal order in the case so that the parties could expand the record, which they did. The judge then reported the above questions.

In his memorandum and report, the judge made a number of findings based on the submissions of the parties, including affidavits from a member of the city council of Lowell and the superintendent of police for Lowell.[3] The judge found that the ordinance, which was adopted on August 9, 1994, was a response to both national and local increases in juvenile crime. At the national level between 1988 and 1992, "aggravated assault cases among juveniles increased by eighty percent, homicides by fifty-five percent, robberies by fifty-two percent, and forcible rape by twenty-seven percent." In Lowell, only nine minors were arrested for assault and battery in 1982, but 102 minors were arrested for the same crime in 1993, an increase of about 1,133%. Lowell also witnessed several violent incidents in 1994, leading to the adoption of the ordinance. Early on the morning of August 1, a sixteen year old was badly beaten by members of a rival gang at Morey Park; around 11 P.M. the night before, a gang confrontation had led to the arrest of four teenagers; and on August 3, a gang fight allegedly involving minors occurred around 10:30 P.M.

After "months of planning," the Lowell city council adopted the ordinance. The ordinance sets out a series of findings made by the council,[4] followed by a statement of its purposes to:

"(1) protect minors from each other and other persons in public places and establishments during nocturnal hours;

"(2) assist the police in crime prevention;

---

[3] The parties did not request, and the judge did not conduct, an evidentiary hearing.

[4] "WHEREAS, the City Council has determined that there has been an increase in juvenile violence, juvenile gang activity, and crime by persons under the age of [seventeen] in the City of Lowell; and

"WHEREAS, persons under the age of [seventeen] are particularly susceptible by their lack of maturity and experience to participate in unlawful and gang-related activities and to be victims of older perpetrators of crime; and

"(3) promote parental supervision and authority over minors;

"(4) protect the public from nocturnal crime and mischief by minors;

"(5) promote the furtherance of family responsibility and for the public good, safety and welfare."

To accomplish these purposes, the ordinance establishes curfew hours of 11 P.M. until 5 A.M., seven days a week, for minors. A minor is defined as a person under seventeen years of age. A minor "commits an offense if he/she remains, either on foot or in a vehicle, in any public place or on the premises of any establishment within the City of Lowell during youth protection curfew hours."[5]

There are nine exceptions to the curfew. No violation occurs if the minor is accompanied by the minor's parent or guardian; on an errand at the direction of the minor's parent or guardian; in a motor vehicle involved in interstate travel; engaged in, going to, or returning from an employment activity; involved in an emergency; on the sidewalk abutting the minor's residence; attending certain school, religious, or recreational activities; exercising rights protected by the First Amendment to the United States Constitution; or married and in compliance with G. L. c. 207, §§ 7 and 25 (establishing requirements for person under eighteen years of age to marry).

---

"WHEREAS, the City of Lowell has an obligation to provide for the protection of minors from each other and from other persons, for the enforcement of parental control over and responsibility for children, for the protection of the general public, and for the reduction of the incidence of juvenile criminal activities; and

"WHEREAS, a youth protection curfew for those under the age of [seventeen] will be in the interest of the public health, safety, and general welfare and will help to attain the foregoing objectives and to diminish the undesirable impact of such conduct on the citizens of the City of Lowell."

[5] Adults can also violate the ordinance. "(2) A parent or guardian of a minor commits an offense if he knowingly permits, or by insufficient control allows, the minor to remain, either on foot or in a vehicle, in any public place or on the premises of any establishment within the city during youth protection curfew hours. (3) The owner, operator, or any employee of an establishment commits an offense if he knowingly allows a minor to remain upon the premises of the establishment during youth protection curfew hours." These provisions of the ordinance are not before the court.

If a police officer suspects that a person is violating the ordinance, the officer must first speak with the suspect.[6] Then, if the officer believes a violation has occurred, he may enforce the ordinance "by arrest or by criminal complaint or by non-criminal disposition as hereinafter provided."

The ordinance then establishes the criminal and civil penalties that result from violations. Under the heading "Criminal Disposition," it provides:

> "Upon arrest and/or criminal complaint, a person who violates a provision of this Article II shall be, if so found by the Court, guilty of a separate offense for each day or part of a day during which the violation is committed, continued, or permitted. Each offense, upon conviction, is punishable by a fine not to exceed $300.00."

Under "Noncriminal Disposition," it provides:

> "Any person who violates any provision of this Article II may be penalized by a noncriminal disposition as provided under Section 1-16 of the Code and Mass. General Laws Chapter 40, Section 21D, as amended. This Article shall be enforced by a Police Officer of the City of Lowell who shall issue a 'Notice to Appear' in Court. The penalty for each violation shall be fifty dollars ($50) for each day or part of the day during which the violation is committed, continued, or permitted. A copy of the 'Notice to Appear' in Court which is given to a minor shall be forwarded to the parent(s) or Guardian(s) of said minor for informational purposes."

Finally, the ordinance includes a severability clause in the event that any portion of it should be found invalid.[7]

---

[6] "Before taking any enforcement action under this section, a police officer shall ask the apparent offender's age and reason for being in the public place, or on the premises of an establishment. The officer shall not make an arrest or issue a notice to appear . . . unless the officer reasonably believes that an offense has occurred and that . . . no defense under subsection 12-22 is applicable."

[7] "Severability is intended throughout and within the provisions of this ordinance. If any provision, including, inter alia, any exception, part, phrase or term or the application to any person or circumstances is held to be invalid, other provisions or the application to other persons or circumstances shall not

2. *Discussion.* We begin by responding to the second reported question: "What is the appropriate standard of review in considering an equal protection challenge to a juvenile curfew ordinance in this Commonwealth?" We then apply that standard of review to the curfew provisions at issue in this case.

a. *Standard of review.* All people in the Commonwealth are guaranteed the right to equal protection of the laws by the United States Constitution and the Massachusetts Declaration of Rights.[8] Under both Constitutions,[9] "[w]here a statute implicates a fundamental right or uses a suspect classification, we employ 'strict judicial scrutiny.' " *Goodridge, supra,* quoting *Lowell* v. *Kowalski,* 380 Mass. 663, 666 (1980). "For all other statutes, we employ the ' "rational basis" test.' " *Goodridge, supra,* quoting *English* v. *New England Med. Ctr.,* 405 Mass. 423, 428 (1989). Age is not a suspect classification, and so the government may treat age groups differently without triggering strict scrutiny. See *Gregory* v. *Ashcroft,* 501 U.S. 452, 470 (1991); *Harlfinger* v. *Martin,* 435 Mass. 38, 50 (2001). The question, then, is whether the ordinance implicates a fundamental right.

The United States Supreme Court has long recognized that the United States Constitution protects a right to travel between States. See *Shapiro* v. *Thompson,* 394 U.S. 618, 630 (1969). See also *United States* v. *Guest,* 383 U.S. 745, 757 (1966) ("constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union"). That right, although not explicitly enumerated, see *Shapiro* v. *Thompson, supra* at 630 & n.8, may be grounded in

be affected thereby. It is intended that the ordinance would not be applied where its application would be unconstitutional."

[8] The Fourteenth Amendment to the United States Constitution states: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

Article 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments, states: "All people are born free and equal, and have certain natural, essential and unalienable rights . . . . Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

[9] "The standard for equal protection analysis under our Declaration of Rights is the same as under the Federal Constitution." *Brackett* v. *Civil Serv. Comm'n,* 447 Mass. 233, 243 (2006). See *Commonwealth* v. *Burgess,* 450 Mass. 366, 376 & n.10 (2008).

the privileges and immunities clause of the Fourteenth Amendment, see *Saenz* v. *Roe*, 526 U.S. 489, 501-503 & n.15 (1999); the commerce clause, see *Edwards* v. *California*, 314 U.S. 160, 172-174 (1941); or the original Articles of Confederation, see *Zobel* v. *Williams*, 457 U.S. 55, 79-81 (1982) (O'Connor, J., concurring in the judgment). See also *Hutchins* v. *District of Columbia*, 188 F.3d 531, 536-537 (D.C. Cir. 1999) (*Hutchins*). The Supreme Court, however, has "specifically declined to decide whether the right to interstate travel recognized in *Shapiro* has its analogue in *intrastate* travel" (emphasis added). *Hutchins*, *supra* at 537, citing *Memorial Hosp.* v. *Maricopa County*, 415 U.S. 250, 255 (1974). Circuit Courts of the United States Court of Appeals disagree whether the Federal Constitution protects such a right. See *Hutchins*, *supra* at 537-538, comparing *Wardwell* v. *Board of Educ. of the City Sch. Dist. of Cincinnati*, 529 F.2d 625, 627-628 (6th Cir. 1976) (rejecting argument that Federal Constitution protects fundamental right to intrastate travel), with *King* v. *New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) ("meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative [right to intrastate travel]").

In light of that uncertainty, State and Federal courts that have addressed curfews similar to the one before us have reached widely disparate conclusions on the proper standard of review. The United States Court of Appeals for the District of Columbia Circuit, for example, framed the issue as whether minors "have a fundamental right to be on the streets at night without adult supervision." *Hutchins*, *supra* at 538. The court answered in the negative, and employed the rational basis test to uphold the curfew. *Id.* at 538-540. In contrast, the United States Court of Appeals for the Ninth Circuit and the Fifth Circuit and the Supreme Court of Alaska have recognized or assumed that the curfews implicated a fundamental right, and have applied strict scrutiny. See *Nunez* v. *San Diego*, 114 F.3d 935, 944-945 (9th Cir. 1997) (*Nunez*) (Federal Constitution protects "fundamental right to free movement"); *Qutb* v. *Strauss*, 11 F.3d 488, 492 (5th Cir. 1993) (*Qutb*) (assuming that right "to move about freely in public" is fundamental); *Treacy* v. *Anchorage*, 91 P.3d

252, 265 (Alaska 2004) (*Treacy*) (assuming that right to intra-
state travel, which court had previously recognized, is funda-
mental).[10]

Still other courts have applied "intermediate scrutiny" to
curfews for minors. See *Ramos* v. *Vernon*, 353 F.3d 171, 179-
180 (2d Cir. 2003) (*Ramos*); *Schleifer* v. *Charlottesville*, 159
F.3d 843, 847 (4th Cir. 1998) (*Schleifer*). In *Schleifer*, the court
concluded that intermediate scrutiny was the appropriate standard
because minors possess only "qualified rights" that "are not
coextensive with those of adults." *Id.* The United States Court
of Appeals for the Second Circuit agreed that there are "vulner-
abilities particular to minors" and that they "constitutionally
may be treated differently than adults," but declined to conclude
that minors' rights are different from those afforded adults. *Ra-
mos, supra* at 178-180, quoting *Bellotti* v. *Baird*, 443 U.S. 622,
635 (1979) (plurality opinion). In all of these cases, the courts
have had to confront both whether the right to free movement
exists and, if so, whether minors possess it fully formed. We ad-
dress each issue in turn.

We have presumed that the Declaration of Rights may protect
some right to intrastate travel, but we have not explicitly decided
the question. See *Milton* v. *Civil Serv. Comm'n*, 365 Mass. 368,
371 n.2 (1974) (statute governing police officer selection process
would not violate right to intrastate travel, "assuming arguendo
that such a right were constitutionally protected"). This case
does not raise, and we need not decide, whether the Declaration
of Rights protects all forms of intrastate travel.[11] We do, how-
ever, reach the following conclusion: the Massachusetts Declara-

---

[10]Those courts also rejected arguments that the rights "are not fundamental
rights for minors," *Nunez* v. *San Diego*, 114 F.3d 935, 944 (9th Cir. 1997); or
that "the rights of children are not coextensive with those of adults," *Treacy*
v. *Anchorage*, 91 P.3d 252, 265 (Alaska 2004). Cf. *Qutb* v. *Strauss*, 11 F.3d
488, 492 n.6 (5th Cir. 1993), citing *Bellotti* v. *Baird*, 443 U.S. 622, 634 (1979)
(plurality opinion) (when State regulates juveniles, State's interest may become
more compelling).

[11]For example, the United States Supreme Court has recognized that the
analogous right to interstate travel contains at least three components, includ-
ing "the right of a citizen of one State to enter and to leave another State, the
right to be treated as a welcome visitor rather than an unfriendly alien when
temporarily present in the second State, and, for those travelers who elect to
become permanent residents, the right to be treated like other citizens of that
State." *Saenz* v. *Roe*, 526 U.S. 489, 500 (1999).

tion of Rights guarantees a fundamental right to move freely within the Commonwealth.

Article 1 of the Declaration of Rights, as amended by art. 106 of the Amendments, establishes that "[a]ll people . . . have certain natural, essential, and unalienable rights," including "the right of enjoying and defending their lives and liberties" and "that of seeking and obtaining their safety and happiness." Inherent in the right to life, liberty, and happiness is the right to move freely and peacefully in public without interference by police. The Declaration of Rights further protects the right to vote, art. 3, as amended by art. 11 of the Amendments; the right to assemble peaceably, art. 19; the right to free speech, art. 16; and the right to be protected in the enjoyment of life, liberty, and property, art. 10. The ability to exercise those rights would be severely curtailed if Massachusetts residents possess no attendant, fundamental right to move about in public. See, e.g., *Benefit* v. *Cambridge*, 424 Mass. 918, 919 (1997) (ban on "wandering abroad and begging" violates right to free speech). In Massachusetts, all people "possess[] the fundamental right, inherent in citizens of all free governments, peaceably to dwell within the limits of [the Commonwealth], [and] to move at will from place to place therein." *United States* v. *Wheeler*, 254 U.S. 281, 293 (1920).[12]

Fundamental rights are not absolute, *Commonwealth* v. *Bruno*, 432 Mass. 489, 503 (2000), and not all burdens on the right to freedom of movement trigger strict scrutiny. The government could attempt to impose a wide range of restrictions on movement, from potentially "draconian curfew" laws to "ordinary traffic lights." *Hutchins, supra* at 538.[13] Strict scrutiny is triggered only when the burden imposed constitutes a significant

[12]A three-member plurality of the Supreme Court has appeared willing to recognize a fundamental right to freedom of movement. See *Chicago* v. *Morales*, 527 U.S. 41, 53 (1999) (plurality opinion) ("freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment").

[13]As the Supreme Court of Wisconsin accurately stated in *Brandmiller* v. *Arreola*, 199 Wis. 2d 528, 543 (1996), when it considered a challenge to "anti-cruising" laws as violative of the fundamental right to interstate travel: "Unlimited access to roadways would result not in maximizing an individual's opportunity to engage in protected activity, but in chaos. To prevent this, state and local governments must enjoy some degree of flexibility to regulate access to, and use of, the publicly held instrumentalities of travel."

penalty; otherwise, rational basis review is appropriate. Cf. *Lee v. Commissioner of Revenue*, 395 Mass. 527, 530-531 (1985) ("Only those statutes resulting in some significant effect on the right to [interstate] travel will be deemed 'penalties'. . . . Less significant impositions . . . have been upheld when supported by a rational or conceivable basis"). Because curfews represent a particularly sweeping restriction on the right to free movement, requiring a person to remain in a confined area for long periods of the day or night, strict scrutiny is the appropriate standard for evaluating them.[14]

We reject the rationale used by some courts to justify a lower standard of review, that the rights of minors are not coextensive with or are weaker than those afforded adults. Minors possess fully formed constitutional rights. See *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority"). However, in applying the strict scrutiny test to their infringement, we recognize that the government has a countervailing compelling interest in "protect[ing] children from actual or potential harm," *Blixt v. Blixt*, 437 Mass. 649, 656 (2002), cert. denied, 537 U.S. 1189 (2003), an interest that often justifies restrictions that could not be sustained when applied to the fundamental rights of adults. See *Bellotti v. Baird*, *supra* at 634 (constitutional principles should be applied with "flexibility" to minors because minors are vulnerable and unable to make decisions in "informed, mature manner"); *Matter of Gail*, 417 Mass. 321, 326-327 (1994), quoting *Custody of a Minor*, 375 Mass. 733, 754 (1978) (Commonwealth has "long-standing interest in protecting the welfare of children living within its borders"). In other words, the analysis "should consider whether the state's interests may be more compelling but not whether the rights involved are less

---

[14]When imposed carelessly, curfews constitute a potentially devastating restriction on fundamental rights. They have been employed by foreign dictators to stifle political opposition. Power, Pinochet and the Uncertain Globalization of Criminal Law, 39 Geo. Wash. Int'l L. Rev. 89, 97 (2007) (in Chile after 1973 coup, military junta imposed blanket curfew). Even in our own country, they have an ignominious past. See *Hirabayashi v. United States*, 320 U.S. 81, 88 (1943) (World War II curfew required "all alien Japanese, all alien Germans, all alien Italians, and all persons of Japanese ancestry" to "be within their place of residence between the hours of 8:00 P.M. and 6:00 A.M.").

fundamental." *Nunez, supra* at 945, citing *H.L.* v. *Matheson*, 450 U.S. 398, 441 n.32 (1981) (Marshall, J., dissenting). See *Qutb, supra* at 492 n.6.[15]

For these reasons, the answer to the second reported question is the "strict scrutiny" standard.

b. *Application.* To pass the strict scrutiny standard, the ordinance must be narrowly tailored to further a legitimate and compelling governmental interest and be the least restrictive means available to vindicate that interest. See *Treacy, supra* at 266. The minors concede that the ordinance addresses "legitimate and compelling state interests." We turn to the remaining prong: whether the ordinance "is limited as narrowly as possible consistent with its proper purpose." *Commonwealth* v. *Chou*, 433 Mass. 229, 237 n.6 (2001).

The ordinance imposes a six-hour curfew (from 11 P.M. until 5 A.M.) on persons under seventeen years of age, subject to certain exceptions. Under the heading "Noncriminal Disposition," the ordinance establishes a fifty dollar civil penalty for each violation. If the violator is a minor, the police officer must issue a " 'Notice to Appear' in Court" to the minor, and must forward the notice to the "parent(s) or Guardian(s) of said minor for informational purposes."

We are persuaded that the curfew itself is sufficiently tailored to achieve the legitimate goals of the ordinance. The hours are similar to curfew hours that other courts have upheld as constitutional. See *Schleifer, supra* at 846 (12:01 A.M. until 5 A.M. on week nights, 1 A.M. until 5 A.M. on weekends). See also *Hutchins,*

---

[15]The Commonwealth has often exercised its authority to protect children. *Planned Parenthood League of Mass., Inc.* v. *Attorney Gen.*, 424 Mass. 586, 594 (1997) ("For years, the Commonwealth has had numerous laws protecting minors by limiting their rights in ways not applicable to adults"). See *Blixt* v. *Blixt*, 437 Mass. 649, 656-657 nn.10-13 (2002), cert. denied, 537 U.S. 1189 (2003) (examples of State interventions to protect minors); G. L. c. 138, §§ 34, 34A (prohibiting purchase or attempt to purchase alcohol by person younger than twenty-one years of age); G. L. c. 112, § 12S (requiring notification of parent or judicial order before woman under age of eighteen year may obtain abortion); G. L. c. 64C, § 10 (prohibiting persons under eighteen years of age from purchasing cigarettes); G. L. c. 140, § 130 (prohibiting sales of certain firearms to persons under eighteen years of age); G. L. c. 207, §§ 7, 24, 25 (requiring parental consent before minor may marry); G. L. c. 76, § 1 (providing for compulsory school attendance).

*supra* at 534 (11 P.M. until 6 A.M. on week nights, midnight until 6 A.M. on weekends); *Qutb, supra* at 490 (same).[16] The curfew is also limited in many important respects. No violation occurs if the minor is accompanied by a parent or guardian, involved in First Amendment speech or religious activity, engaged in an employment activity, or on an errand at the direction of the minor's parent or guardian. These exceptions are nearly identical to those in the *Hutchins* and *Qutb* cases, and are more extensive than those found in *Ramos*. See *Ramos, supra* at 172; *Hutchins, supra* at 535; *Qutb, supra* at 490.[17]

In addition, there is no evidence that the passage of the curfew was for an invalid or improper purpose. The *Ramos* case provides an interesting contrast. In that case, a member of the town council (and a witness for the town of Vernon) testified that the town's curfew had been passed in part because she had observed an "increase in the number of younger people" on the town's streets, and that on Sunday mornings she had observed "people who look[ed] like skinheads." *Id.* at 184. An expert also testified that the Vernon curfew represented a "knee jerk reaction" to increased loitering and the murder of a sixteen year old male inside his home. *Id.* at 184, 187. The *Ramos* court noted that it made little sense to impose a late-night curfew to prevent loitering observed during daylight hours, or to prevent indoor murders. *Id.* at 186. The court concluded that the council did not carefully study the issue prior to enacting the curfew, nor did it provide evidence that the curfew had achieved an identified goal. *Id.* at 186-187.

Here the judge found that the city council adopted the ordinance only "after months of planning, debating, and researching models from other cities." Moreover, the judge credited the submissions that Lowell suffered a rapid increase of juvenile crime and gang activity just before the ordinance was enacted. In 1994, several Lowell newspaper articles reported that minors

---

[16]The fact that the Lowell curfew establishes identical curfew hours for weekdays and weekends is somewhat problematic but is not, at least on the present record, fatal to its constitutionality.

[17]The ordinance also required Lowell's city manager to conduct a review after its passage to study its effect on crime statistics. The judge did note that there was some evidence of declining arrest rates of minors after it was enacted, but declined to make a finding on the issue without additional data.

had been violently attacked or killed. According to the United States Department of Justice, from 1988 to 1994 there was a similar nationwide spike in juvenile arrests for aggravated assault and murder. Although Lowell's data are not comprehensive, the statistics do show a sufficient connection between the goals of the ordinance and its substance. "We do not demand of legislatures 'scientifically certain criteria of legislation.' " *Schleifer, supra* at 849, quoting *Ginsberg* v. *New York*, 390 U.S. 629, 642-643 (1968). Based on the various news accounts, affidavits of the police superintendent and other public officials, and the additional findings of the judge in this case, the Commonwealth has met its burden of establishing that the curfew hours imposed by this ordinance, and the age established for minors, are narrowly tailored to its stated goals.[18]

We also conclude that the ordinance's civil enforcement mechanism is reasonable, balanced, and narrowly tailored, especially in light of the government's need for flexibility when acting to protect children. See *Bellotti* v. *Baird*, 443 U.S. 622, 635 (1979) (plurality opinion). It authorizes a police officer to approach a person who appears to be a minor on the street late at night and suspected of violating the ordinance, and ask for identification. As the judge found, "This process alone acts as a deterrent to criminal activity." It also ensures the safety of the minor and the safety of the public. If the minor is in violation of the

[18]The evidence submitted in the form of arrest and crime reports and affidavits from law enforcement personnel suggest that the time period when minors are most at risk may be from 3 P.M. to 9 P.M. (or perhaps 2 P.M. to 6 P.M.). However, as the superintendent of the Lowell police department outlined in his affidavit, a curfew for minors for that period of time would be impractical and unworkable, and the Lowell police department had pursued other initiatives in partnership with the community to provide a significant number of after-school activities for the purpose of addressing the afternoon and early evening. The superintendent also noted that crimes, and particularly violent crimes, disproportionately occur during the 11 P.M. to 5 A.M. curfew hours.

It is important to note that a curfew must, in the end, be justified on the basis of the particular situation in each community. *Ramos* v. *Vernon*, 353 F.3d 171, 185 (2d Cir. 2003) (not enough for town to recite interests used to support curfew ordinance in other communities). The record supports a finding that gang activity in Lowell (as of 2005) remained a significant problem and risk to juveniles. However, the continued viability and constitutional validity of a curfew requires periodic review of its need, effectiveness, and impact. The evidentiary material submitted in the present case was prepared in 2005.

ordinance, the officer may cite him or her, and must engage the parent or guardian in the process by giving them notice of the citation. Repeated citations for curfew violations may also lead to the identification of a minor who is in need of services, prompting the involvement of the Department of Children and Families (DCF).[19] In addition, the fifty dollar civil penalty (and the notice to appear in court) reinforce the importance of the curfew ordinance, and provide a measure of deterrence, without being financially or otherwise ruinous.[20] Importantly, the civil enforcement mechanism aims to achieve its goals without creating a juvenile "record," as G. L. c. 40, § 21D, provides that the noncriminal disposition of a city ordinance "shall [not] be entered in any probation records."[21] And, insofar as the civil enforcement of the ordinance does not provide for a minor's arrest, it reflects a proper balancing of the minor's liberty interest with the public interest, and ensures that such intrusions will not become a tool of harassment.[22]

---

[19]Concerning a determination whether a child is in need of services, see generally G. L. c. 119, §§ 1, 21, and 39E-39H (CHINS statute). Pursuant to § 39E, petitions for the determination that a child is in need of service may be brought in the Juvenile Court by a parent, guardian, or police officer, and on the recommendation of a Juvenile Court probation officer. Proceedings under the CHINS statute are not criminal proceedings. *Id.*

[20]The imposition of a fifty-dollar penalty on a minor may require that the minor be given a sufficient period of time to pay the penalty. In circumstances where it cannot reasonably be paid (and in order to withstand constitutional challenge), the minor must be provided with an alternative form of compliance such as a period of community service work. See, e.g., *Hutchins* v. *District of Columbia*, 188 F.3d 531, 535 (D.C. Cir. 1999) ("Minors found in violation of the curfew may be ordered to perform up to [twenty-five] hours of community service for each violation"). The record reflects that shortly after the curfew was enacted the Lowell police department sought to establish a community service program "in lieu of paying fines" with the court, but there is no further information whether such a program has been implemented.

[21]General Laws c. 40, § 21D, also provides that the failure of a person to pay the civil penalty can lead to the issuance of a complaint for the violation of a city ordinance. The applicability of that provision to a curfew ordinance from which the application of the criminal provision has been struck on constitutional grounds is not before us.

[22]The police retain the authority to take any person, including a juvenile, into protective custody if he or she is incapacitated, G. L. c. 111B, § 8; and to take a child under the age of seventeen into protective custody for up to four hours if the child is found in the presence of a class A, B, or C substance. G. L. c. 94C, § 36.

Beyond civil penalties, however, the ordinance also creates criminal consequences. Some are intended; under the heading "Criminal Disposition," the ordinance establishes a $300 fine for each violation. Others may have been unintended. Of most consequence, a minor who violates the criminal provisions of a municipal ordinance may be adjudicated to be a "delinquent child." See G. L. c. 119, § 52.[23] Once a child is deemed "delinquent," Juvenile Court judges have the authority to commit the minor to the custody of the DYS until age eighteen. G. L. c. 119, § 58.[24] This concern is not merely academic; the Juvenile Court judge noted that there have been "numerous cases in which youth have been arraigned for curfew ordinance arrests and bail requests have been made. Juveniles have been found to be delinquent for such conduct and have been placed on probation and then faced D.Y.S. commitment for subsequent probation violations."

The criminal prosecution of a minor, with its potential for commitment to DYS, is an extraordinary and unnecessary response to what is essentially a status offense,[25] and is contrary to the State's treatment of similar conduct. For example, when it enacted the child in need of services (CHINS) statute, G. L. c. 119, § 21,[26] the Legislature specifically rejected criminal

---

[23]A delinquent child is "a child between seven and seventeen who violates any city ordinance or town by-law or who commits any offence against a law of the commonwealth." G. L. c. 119, § 52. The noncriminal disposition of a city ordinance pursuant to G. L. c. 40, § 21D, cannot be the basis of a delinquency finding, insofar as that statute specifically provides that such a disposition "shall not be deemed to be a criminal proceeding. No person . . . shall be required to report to any probation officer [as a result], and no record of the case shall be entered in any probation records."

[24]General Laws c. 119, § 58, provides in pertinent part: "If a child is adjudicated a delinquent child on a complaint, *the court* may place the case on file or may place the child in the care of a probation officer for such time and on such conditions as it deems appropriate or *may commit him to the custody of the department of youth services*, but the probationary or commitment period shall not be for a period longer than until such child attains the age of eighteen, or nineteen in the case of a child whose case is disposed of after he has attained his eighteenth birthday" (emphasis added).

[25]A status offense in these circumstances has been defined as "an act, which if committed by adults, does not constitute a criminal offense." *In re D.L.D.*, 110 Wis. 2d 168, 169 n.1 (1983). See R.L. Ireland, Juvenile Law § 4.1 (2d ed. 2006).

[26]A child in need of services is defined as a minor who persistently "runs

sanctions for status offenses by minors. *Commonwealth* v. *Florence F.,* 429 Mass. 523, 524-525 (1999). The CHINS statute "decriminalizes status offenses by focusing on providing non-punitive care to address the problem of certain children," and "signified a switch from criminalizing truancy and children in need of services to providing protective care for children." *Id.* at 527. The statute itself provides that it must "be liberally construed so that . . . [children] shall be treated, *not as criminals,* but as children in need of aid, encouragement and guidance" (emphasis added). G. L. c. 119, § 53. Both explicitly (through "Criminal Disposition") and in effect (through possible commitment to DYS), the ordinance undermines these goals by criminalizing status offenses of minors.

Additionally, the Commonwealth has failed to meet its burden to show that the use of criminal penalties provides an increased benefit over the civil enforcement mechanisms of the ordinance sufficient to offset their greater intrusion on the fundamental right. In other words, it has failed to demonstrate that the use of the criminal process and penalties is the least restrictive means of accomplishing its legitimate objective. It makes two passing arguments in its brief in support of the marginal utility of the criminal provision. First, the Commonwealth contends in one sentence that the provision "gives police officers the authority to arrest minors for curfew violations." It does not, however, point to any evidence in the record to support the added utility of this power, nor does it explain why the police should have the power to arrest minors for status offenses, a power in contradiction to the decriminalization goals outlined in the CHINS statute. Second, the Commonwealth argues that "a minor could potentially receive community service as part of his or her probationary sentence." But again, the Commonwealth fails to offer any evidence that community service would be helpful or effective in preventing juvenile crime. Rather, it suggests only that community service "*may* deter a minor from getting into further trouble with law enforcement and *possibly* prevent a minor from engaging in criminal conduct as an adult" (emphasis

away from the home of a parent or legal guardian," "fails to obey the lawful and reasonable commands of a parent or legal guardian," "fails to attend school," or who "fails to obey lawful and reasonable school regulations." G. L. c. 119, § 21.

added). The arguments are nothing more than conjecture, insufficient to meet the Commonwealth's burden on this prong of the "strict scrutiny" test.

3. *Conclusion.* Applying the strict scrutiny standard, the ordinance's criminal provision unconstitutionally infringes on the minors' rights to freedom of movement. Status offenses such as being abroad at night may not be "bootstrapped" into criminal delinquency and commitment to DYS custody. See *Commonwealth* v. *Florence F., supra* at 528 n.8. In response to the first reported question, the answer is "Yes" with regard to criminal penalties resulting from violations of the ordinance. The curfew itself and its civil enforcement mechanism, however, represent, as of the date of the proceedings below, a permissible, narrowly tailored response to Lowell's compelling interest in preventing crime by, and against, minors. Because the ordinance contains a severability clause, those provisions remain in force.

The cases are remanded to the Juvenile Court for further proceedings consistent with this opinion.

*So ordered.*

SPINA, J. (concurring). I concur with the court's answers to the reported questions. However, I depart from the court's reasoning.

The Juvenile Court judge has asked generally if Lowell's curfew ordinance is unconstitutional and specifically whether it violates equal protection. He also asks what is the appropriate standard of review. The court notes that under both the Massachusetts and the United States Constitutions, "[w]here a statute implicates a fundamental right or uses a suspect classification, we employ 'strict judicial scrutiny.' " *Ante* at 30, quoting *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 330 (2003). As the court acknowledges, because age is not a suspect classification, *Gregory* v. *Ashcroft*, 501 U.S. 452, 470 (1991), there is no equal protection violation merely because the curfew rules apply only to juveniles. The court continues its equal protection analysis by inquiring whether the ordinance implicates a funda-

mental right guaranteed by either Constitution. It is in this context that the court, for the first time, holds that the Massachusetts Constitution includes a fundamental right to "free movement." *Ante* at 32-33. I do not think it is necessary to articulate a new right to decide this case. The court can reach the same conclusions by relying on our precedents defining a fundamental right to liberty.

While the equal protection approach has merit, an equally appropriate (and in my view a preferred) analysis is to determine whether the ordinance violates substantive due process. Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concepts of ordered liberty.' " *Commonwealth* v. *Bruno*, 432 Mass. 489, 503 (2000), quoting *Aime* v. *Commonwealth*, 414 Mass. 667, 673 (1993). When considering the right to liberty, we have most often done so in the context of due process, not equal protection. Most recently, we reiterated that "[f]reedom from bodily restraint is a fundamental liberty interest at the core of the protections provided under the due process clause of the Fourteenth Amendment to the Federal Constitution." *Kenniston* v. *Department of Youth Servs.*, 453 Mass. 179, 183 (2009), and cases cited.

In analyzing whether a fundamental right is implicated, the court first should turn to our precedents. Liberty is a fundamental right. A curfew by definition, or at least by strong implication, is a deprivation of liberty as it confines those individuals subject to it to the indoors. The Lowell ordinance requires the juvenile to remain in his home for six hours each day under threat of prosecution. This is a substantial infringement on liberty. As the court notes, "a minor who violates the criminal provisions of a municipal ordinance may be adjudicated to be a 'delinquent child' . . . [and] [o]nce a child is deemed 'delinquent,' Juvenile Court judges have the authority to commit the minor to the custody of the [Department of Youth Services (DYS)] until age eighteen." *Ante* at 39. Because of the liberty lost by the imposition of the curfew and the threat of institutionalization after commitment to DYS, a strict scrutiny analysis is appropriate.

Although the loss of liberty experienced under the Lowell curfew is not incarceration, it is a form of house arrest that is so

intrusive on liberty as to warrant analogy to that precedent. For example, the United States Supreme Court has "repeatedly . . . recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington* v. *Texas*, 441 U.S. 418, 425 (1979). See *Guardianship of Roe*, 383 Mass. 415, 424 (1981) ("confinement for any purpose constitutes a significant deprivation of liberty" requiring due process [beyond a reasonable doubt standard]). See also *Commonwealth* v. *Nassar*, 380 Mass. 908, 917 (1980), quoting *Lessard* v. *Schmidt*, 349 F. Supp. 1078, 1093 (E.D. Wis. 1972), vacated and remanded on other grounds, 414 U.S. 473 (1974) (commitment of mentally ill "massive curtailment of liberty" implicating due process [enhanced standard of proof]). Further, in *Newton-Wellesley Hosp.* v. *Magrini*, 451 Mass. 777, 784 (2008), citing *Commonwealth* v. *Nassar, supra*, we recognized that even "temporary involuntary commitment" is a "massive curtailment" of liberty. Here, the court recognizes that "[w]hen imposed carelessly, curfews constitute a potentially devastating restriction on fundamental rights." *Ante* at 34 n.14, citing Power, Pinochet and the Uncertain Globalization of Criminal Law, 39 Geo. Wash. Int'l L. Rev. 89, 97 (2007). Cf. *Commonwealth* v. *Nassar, supra* at 916-917 (civil commitment under G. L. c. 123 need not involve commitment to State institution with total loss of liberty).

Where the fundamental right at stake is liberty, the substantive due process analysis undertaken by this court in *Paquette* v. *Commonwealth*, 440 Mass. 121, 124-125 (2003), cert. denied, 540 U.S. 1150 (2004) (pretrial detention after bail revocation), and *Commonwealth* v. *Bruno*, 432 Mass. 489 (2000) (commitment of allegedly sexual dangerous persons), is comparable to the equal protection analysis the court employs in this case. In those cases we explained that where the right involved "is 'fundamental,' we ' "must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore* v. *East Cleveland*, 431 U.S. 494, 499 (1977).' *Aime* v. *Commonwealth*, 414 Mass. 667, 673 (1993). See *Commonwealth* v. *Bruno*, 432 Mass. 489, 503 (2000). A State 'may impose a regulatory restraint on the individual in narrowly-circumscribed situations.' A statute

imposing such a restraint typically will be upheld only if it is 'narrowly tailored to further a legitimate and compelling governmental interest.' *Id.* at 673." *Paquette* v. *Commonwealth, supra* at 125. See *Commonwealth* v. *Bruno, supra.*

Applying a substantive due process analysis based to the loss of liberty, I would hold that the ordinance's civil penalties "represent . . . a permissible, narrowly tailored response to Lowell's compelling interest in preventing crime by, and against, minors." *Ante* at 41. Furthermore, "[t]he right to substantive due process under the United States Constitution protects individuals from unreasonable governmental interference with fundamental rights." *Kenniston* v. *Department of Youth Servs., supra* at 183, and cases cited. Therefore, the criminal penalties resulting from violations of the curfew ordinance violate the fundamental right of liberty possessed by minors within the Commonwealth, under the Massachusetts Declaration of Rights. I see no need to create a new fundamental right to decide this case, and would decide this case on principles of due process.