NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11682

CHIEF OF POLICE OF THE CITY OF WORCESTER  vs.  RAYMOND J.
HOLDEN, JR.


Worcester.    November 6, 2014. - March 11, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.



Firearms.  License.  Constitutional Law, Right to bear arms,
    Vagueness of statute.  Due Process of Law, Revocation of
    license, Vagueness of statute.  Words, "Suitable person."



    Civil action commenced in the Superior Court Department on
December 6, 2011.

    The case was heard by James R. Lemire, J., on motions for
judgment on the pleadings.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Mel L. Greenberg for the defendant.
    Kevin M. Gould, Assistant City Solicitor (David M. Moore,
City Solicitor, with him) for the plaintiff.
    Julia Kobick, Assistant Attorney General, for the
Commonwealth, amicus curiae.
    The following submitted briefs for amici curiae:
    Jonathan E. Lowy, Kelly Sampson, Elizabeth Burke, Jonathan
L. Diesenhaus, James W. Clayton, & Anna M. Kelly, of the
District of Columbia, & Kathy B. Weinman for Brady Center to
Prevent Gun Violence.

Ben T. Clements & Lila E. Slovak for Massachusetts Chiefs of Police Association, Inc., & others.
Edward F. George, Jr., & Susan Chu for Gun Owners' Action League, Inc.
Karen L. MacNutt for Commonwealth Second Amendment, Inc.

SPINA, J.  This case mounts a challenge under the Second Amendment to the United States Constitution[1] to the constitutionality of the "suitable person" standard in G. L. c. 140, § 131 (d) and (f), as amended through St. 1998, c. 180, § 41, by which licenses to carry firearms were issued, suspended, or revoked between 2005 and 2010.[2]  The chief of police of the city of Worcester (chief) determined, based on the history of domestic violence of Raymond J. Holden, Jr., against his wife, that Holden was not a suitable person to have such a license.  Holden sought judicial review of three separate adverse decisions of the chief:  suspension of his license, then revocation of his license, and finally denial of his application for a new license to carry.  After a complex history of District Court litigation that was consolidated and resolved largely in favor of Holden, the chief sought certiorari review in the Superior Court.  On cross motions for judgment on the pleadings,

---

[1] The Second Amendment to the United States Constitution states:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

[2] The statute was further amended in 2014.  See notes 5, 6, 8, and 10, infra.

a judge in the Superior Court ruled in favor of the chief. Holden appealed, and we granted his petition for direct appellate review. On appeal, Holden argues that (1) the "suitable person" standard violates the Second Amendment, both facially and as applied; (2) the statutory scheme as to the suspension and revocation of licenses and the denial of license applications violates procedural due process because it is devoid of any provision for a hearing before the chief, and because it makes no provision for an aggrieved person to confront and cross-examine witnesses in the District Court; (3) the "suitable person" standard is unconstitutional as applied to him because it allows the chief to disqualify him permanently from licensure as an unsuitable person without current cause; and (4) the decisions of the chief were not supported by substantial evidence. We reject Holden's claims, and we affirm the judgment of the Superior Court.[3]

1. Background. On the evening of September 10, 2005, Holden's daughter telephoned the Shrewsbury police department 911 dispatch to report that her father had just beaten her

---

[3] We acknowledge the amicus briefs of the Attorney General; Brady Center to Prevent Gun Violence; and Massachusetts Chiefs of Police Association, Inc.; Stop Handgun Violence; Educational Fund to Stop Gun Violence; and Jewish Alliance for Law & Social Action, in support of the chief of police of the city of Worcester (chief), and the amicus briefs of Commonwealth Second Amendment, Inc., and Gun Owners Action League, Inc., in support of Raymond J. Holden, Jr.

mother and thrown her out of his vehicle in front of the daughter's house in Shrewsbury. She reported that her mother was crying and that she was requesting police assistance. Police arrived at the daughter's home. Holden's wife prepared and signed a written statement, witnessed by her daughter, in which she described what occurred. She indicated that she and Holden were at a restaurant that evening. After consuming a few cocktails they began to argue. She did not want to create a scene, so she asked the bartender to arrange for a taxicab to take her home. Eventually she left with Holden, who verbally assaulted her and said he was going to leave her at their daughter's home. Upon arrival, Holden punched his wife in the face, walked around to the passenger's side door, and pulled her out of the vehicle. He threw her to the pavement and then drove away. She suffered a swollen lip, a scratch over her right eye, and scrapes and bruises on her left arm.

On September 12, 2005, Holden was arraigned in the Westborough Division of the District Court Department (Westborough District Court) on a complaint alleging assault and battery on his wife. On September 14, 2005, the chief, acting in his capacity as licensing authority for the city of Worcester, suspended Holden's license on the ground that he was not suitable to carry firearms. His decision was based on Holden's arraignment on the assault and battery complaint. The

complaint was dismissed two weeks later at the request of the complainant, Holden's wife.

On December 6, 2005, Holden filed a complaint for judicial review of his suspension in the Worcester Division of the District Court Department (Worcester District Court), pursuant to G. L. c. 140, § 131 (f). After an evidentiary hearing, the judge ordered the restoration of Holden's license because the sole ground for the suspension was the pending charge of assault and battery, which had been dismissed. The judge ruled that the suspension was "arbitrary and capricious in that the withholding of the license [was] not predicated upon any factual determination by [the licensing authority]." On January 30, 2006, the chief reinstated the suspended license.

However, on that same day, immediately after restoring Holden's suspended license, the chief revoked the license. Instead of relying on Holden's arraignment on the then-dismissed complaint for assault and battery, the chief's written decision set forth specific findings based on the police incident report of September 10, 2005, which contained details of the assault and battery as reported by Holden's wife. The chief explained that the credible information in the incident report, and not the mere existence of a criminal charge, were the grounds on which he determined Holden to be unsuitable. On March 1, 2006, Holden filed a complaint for judicial review in the Worcester

District Court. A different judge found facts and ruled, without an evidentiary hearing, that the subsequent action by the chief was based on the same evidence that was presented in the earlier action. He ordered the license reinstated. The chief filed a complaint for certiorari in the Superior Court. On May 21, 2007, a judge of the Superior Court determined that the failure to conduct an evidentiary hearing was error, and he remanded the case to the District Court for an evidentiary hearing on the revocation. Holden sought appellate review, but the appeal was dismissed by the Appeals Court on June 30, 2008, on the ground that the Superior Court's order of remand was interlocutory, from which there was no right of appeal.

The case lay dormant for nearly two years. On June 17, 2010, Holden requested a hearing.[4] On September 21, 2010, Holden's revoked license to carry firearms expired. On October 18, 2010, Holden applied to the Worcester police department licensing division for a new license to carry firearms. On November 18, 2010, the chief denied the application on the ground that Holden was not a suitable person to hold such a license. The chief relied upon and cited details from the police incident report of September 10, 2005; the

---

[4] Although Holden's motion regarding this request does not appear on the Worcester District Court docket, the docket states that a memorandum and order issued on that motion on August 10, 2010.

statement signed by Holden's wife on September 10, 2005; and the 911 dispatch call from Holden's daughter. On January 6, 2011, Holden filed a complaint for judicial review of the denial of his application, pursuant to G. L. c. 140, § 131 (f), in Worcester District Court. He also filed a motion to consolidate all three cases, which was allowed. It is not clear why the first case was included, as it had been decided and no notice of appeal had been filed.

A full evidentiary hearing was held before a third judge of the District Court on February 7 and 9, 2011. On October 21, 2011, the judge ruled that the chief had a reasonable ground to suspend and revoke Holden's license in 2005 and 2006, respectively, based upon the reported domestic assault and battery by Holden on his wife on September 10, 2005, notwithstanding dismissal of the criminal charges in the Westborough District Court on October 3, 2005. The judge concluded that the chief had authority to rely on reported behavior of a licensee, even if there had not been any criminal charges. However, the judge vacated the November 18, 2010, denial of Holden's application for a license to carry a firearm and directed that a license to carry be issued to Holden. The judge determined that the chief did not have a reasonable ground for denying the 2010 application where there had been a significant passage of time with no intervening incidents. He

further ruled that a 2006 directive of the chief to the effect that a revocation of license operated as a "permanent loss" constituted an abuse of discretion.

On December 6, 2011, the chief filed a complaint for certiorari review in the Superior Court.  The parties filed cross motions for judgment on the pleadings.  After a hearing, a judge of the Superior Court granted the chief's motion for judgment on the pleadings, and he denied Holden's motion.  The judge reasoned that "[t]he passage of time without interaction with the law . . . does not preclude a finding of unsuitability . . . [but is a] factor that [a licensing authority] is entitled to take into consideration. . . .  [I]t is not appropriate grounds for the District Court to overrule [the chief in this case]."  The judge also concluded that the District Court judge erred in relying on the 2006 directive where there was no evidence that the chief had relied on the directive or that a revoked license actually would result in a lifetime ban.  Finally, the judge determined that the "core of the Second Amendment, the right of an individual to keep and bear arms in the home, was not implicated in [Holden's] case."

2.  As-applied challenge.  Holden argues that the Second Amendment secures for him the right to carry a handgun for self-defense outside the home, and that this right cannot be made subject to a determination by the chief that he is a suitable

person to carry a handgun. He contends that the "suitable person" standard in G. L. c. 140, § 131 (d) and (f), violates the Second Amendment, and that it violates constitutional principles of vagueness. There are several parts to this challenge, which we address in turn.

As an initial matter, it is important to note that the record is silent as to whether Holden had held a Class A license or a Class B license, and whether he applied for a Class A or a Class B license after his revoked license expired. For purposes of this appeal the relevant difference between the two types of licenses is that a Class A license entitles a holder to possess and carry a concealed firearm for all lawful purposes, subject to such restrictions as the licensing authority deems proper. See G. L. c. 140, § 131 (a).[5] A Class B license entitles a holder to "possess and carry . . . non-large capacity firearms . . . for all lawful purposes, subject to such restrictions . . . as the licensing authority deems proper; provided, however, that a Class B license shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed

---

[5] General Laws c. 140, § 131 (a), was amended by St. 2014, c. 284, § 47, effective January 1, 2021. Under the amended statute there will be no Class A and Class B licenses, but a unitary license to carry.

manner in any public way or place." G. L. c. 140, § 131 (b).[6] The analysis is somewhat different for each type of license. We begin with the Class A license.

a. Class A license. Holden's argument begins with a statement from District of Columbia v. Heller, 554 U.S. 570 (2008), made applicable to the States by McDonald v. Chicago, 561 U.S. 742, 791 (2010), where the United States Supreme Court declared self-defense to be "the central component of the [Second Amendment] right itself" (emphasis in original). Heller, supra at 599. The Court was addressing, and rejected, Justice Breyer's dissent where he described individual self-defense as being merely a "subsidiary interest" to the Second Amendment's right to keep and bear arms. Id. at 714 (Breyer, J., dissenting). Holden acknowledges that the Supreme Court also said in Heller that the "need for defense of self, family, and property is most acute" in the home, id. at 628, but he maintains nevertheless that the right of self-defense is the core holding of Heller. He reasons that nothing in Heller suggests that the right to bear arms for self-defense is limited to the home. Relying on Moore v. Madigan, 702 F.3d 933, 942 (7th Cir. 2013), Holden maintains that the right to keep and bear arms to defend oneself is at least as important outside the

---

[6] General Laws c. 140, § 131 (b), was amended by St. 2014, c. 284, § 47, effective January 1, 2021. See note 5, supra.

home as it is inside the home. His argument culminates in the following statement: "By noting that restrictions on carrying firearms 'in sensitive places such as schools and government buildings' . . . were 'presumptively lawful' under the Second Amendment . . . the Court at least suggested that restrictions on carrying firearms outside the home in less 'sensitive' places would violate the right to keep and bear arms," quoting Heller, supra at 626, 627 n.26.

In Heller, 554 U.S. at 635, the Court held that the District of Columbia's total ban on handgun possession in the home violates the Second Amendment. The Court did not say or imply, as Holden argues, that the right of self-defense is as great outside the home as it is inside the home. Indeed, the Court expressed something to the contrary. It said "the need for defense of self, family, and property is most acute" in the home. Id. at 628. The United States Court of Appeals for the First Circuit has observed that, with respect to this language from Heller, "[c]ourts have consistently recognized that Heller established that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment." Hightower v. Boston, 693 F.3d 61, 72 (1st Cir. 2012).

Moreover, mindful of the problem of handgun violence throughout the country, the Supreme Court said that "[t]he

Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, see supra at 624-627, and n.26." Heller, 554 U.S. at 636. As to those measures, the Court observed that "[l]ike most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the [Nineteenth Century] cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626. The Court identified a nonexhaustive list of prohibitions and restrictions on the Second Amendment right, including "prohibitions on carrying concealed weapons[,] . . . longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, . . . [and] laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-627.

Conspicuously absent from Holden's argument is the Supreme Court's inclusion of "prohibitions on carrying concealed weapons" among the "tools" available to combat gun violence. Heller, 554 U.S. at 626, 636. This particular prohibition applies to the possession of firearms outside the home. Significantly, the Court referred to this tool as a "prohibition" on carrying firearms, not merely a restriction.

Moreover, the Court emphasized that prohibitions on carrying concealed weapons and other prohibitions specifically mentioned (and others not specified) were "presumptively lawful."  Id. at 626-627 & n.26.  See Hightower, 693 F.3d at 73.

Because a prohibition against carrying concealed weapons is presumptively lawful, it follows that licensing the carrying of such weapons, a less restrictive measure, also must be presumptively lawful.  See id. at 74.  "Presumptively lawful" prohibitions and regulations do not burden conduct protected by the Second Amendment.  As such, they fall outside the scope of the Second Amendment and are not subject to heightened scrutiny. See Commonwealth v. McGowan, 464 Mass. 232, 239, 244 (2013). For these reasons, we conclude that the denial of a Class A license to carry a concealed firearm, or the revocation or suspension of a Class A license, falls outside the Second Amendment and is subject only to rational basis analysis, as a matter of substantive due process.  See id.

i.  Rational basis.  Those who challenge the constitutionality of a statute that neither burdens a suspect group nor a fundamental constitutional right bear a heavy burden in overcoming the presumption of constitutionality in favor of a statute's validity.  See English v. New England Med. Ctr., Inc., 405 Mass. 423, 427 (1989), cert. denied, 493 U.S. 1056 (1990). Under the Federal Constitution, the rational basis test under

principles of due process is "'whether the statute bears a reasonable relation to a permissible legislative objective' . . . and, under the . . . State Constitution [is] whether the statute 'bears real and substantial relation to public health, safety, morals, or some other phase of the general welfare'" (citations omitted). Id. at 430. Holden offers nothing to overcome the presumption of constitutionality with respect to the regulation of concealed weapons. He relies exclusively on the application of strict scrutiny. Nevertheless, we undertake the analysis.

The purpose of G. L. c. 140, § 131, is to "limit access to deadly weapons by irresponsible persons." Ruggerio v. Police Comm'r of Boston, 18 Mass. App. Ct. 256, 258 (1984). "From a realization that prevention of harm is often preferable to meting out punishment after an unfortunate event, [§ 131] was enacted as a first-line measure in the regulatory scheme. It has been said about § 131 that it was intended 'to have local licensing authorities employ every conceivable means of preventing deadly weapons in the form of firearms [from] coming into the hands of evildoers.'" Id. at 258-259, quoting Rep. A.G., Pub. Doc. No. 12, at 233-234 (1964). Section 131, in addition to excluding certain classes of persons from licensure, requires that the licensing authority ascertain whether an applicant is a "suitable person" to carry firearms and has a

proper purpose for carrying a firearm, and that someone who has been issued such a license remains suitable.  G. L. c. 140, § 131 (d), (f).  The Supreme Court acknowledged precisely the need for such determinations when it said of the Second Amendment, "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (emphasis added).  Heller, 554 U.S. at 635.  Although the statute has been amended,[7] the "suitable person" standard still confers upon a licensing authority "'considerable latitude' or broad discretion in making a licensing decision." Chardin v. Police Comm'r of Boston, 465 Mass. 314, 316, cert. denied sub nom. Chardin v. Davis, 134 S. Ct. 525 (2013), quoting Ruggiero, supra at 259.  Specifically, it allows licensing authorities to keep firearms out of the hands of persons who are not categorically disqualified, e.g., convicted felons, but who nevertheless pose a palpable risk that they would not use a firearm responsibly if allowed to carry in public.  The statute, broadly speaking, bears a reasonable, as well as a real and substantial, relation to public health and safety.  As such, the "suitable person" standard passes muster under the United States and the Massachusetts Constitutions under rational basis analysis.

---

[7] See note 8, infra.

Even if Holden had a Second Amendment interest in carrying a concealed weapon, the suspension and revocation of his license, and the denial of his application for a new license, would survive heightened scrutiny, which we discuss infra.

ii. Vagueness. Holden also contends that the "suitable person" standard is inherently subjective and unconstitutionally vague. "A law is void for vagueness if persons 'of common intelligence must necessarily guess at its meaning and differ as to its application,'" Caswell v. Licensing Comm'n for Brockton, 387 Mass. 864, 873 (1983), quoting Connally v. General Constr. Co., 269 U.S. 385, 391 (1926), or if it "subjects people to an unascertainable standard." Brookline v. Commissioner of the Dep't of Envtl. Quality Eng'g, 387 Mass. 372, 378 (1982), S.C., 398 Mass. 404 (1986). The degree of vagueness that is permissible under principles of due process varies with the interests involved. See Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-499 (1982); Brookline, supra. Flexibility in a statute is necessary to respond to individual cases. See Custody of a Minor (No. 2), 378 Mass. 712, 719 (1979) (to survive vagueness challenge Legislature need not "anticipate and codify every parental shortcoming or handicap that might place an exposed child in danger"). "Ambiguities . . . may be clarified by resort to the administrative process so as to cure a vagueness claim." Brookline, supra.

The term "suitable person" is not defined in the statute as it existed prior to 2015.[8] Nor is it defined by any regulation promulgated by the Executive Office of Public Safety and Security or its designee, despite the Appeals Court's suggestions that guidelines would be beneficial. See MacNutt v. Police Comm'r of Boston, 30 Mass. App. Ct. 632, 636 n.6 (1991); Ruggiero, 18 Mass. App. Ct. at 261 n.7. Other States have "suitable person" standards in their firearms licensing laws. See, e.g., Conn. Gen. Stat. § 29-28(b); Hawaii Rev. Stat. Ann. § 134-9(b)(2); N.H. Rev. Stat. Ann. § 159:6(I); R.I. Gen. Laws § 11-47-11(a). Our decisions have served to help clarify the meaning of the term and limit the scope of discretion of a licensing authority.

For example, in DeLuca v. Chief of Police of Newton, 415 Mass. 155, 159-160 (1993), this court held that a finding of unsuitability properly could be made based on acts underlying convictions even after pardon. The court reasoned that although a pardon removed the disqualifying feature of a conviction, because "character is a necessary qualification and the

---

[8] General Laws c. 140, § 131 (d), was amended by St. 2014, c. 284, § 48, effective January 1, 2015, and now provides in relevant part: "A determination of unsuitability shall be based on: (i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety; or (ii) existing factors that suggest that, if issued a license, the applicant or license may create a risk to public safety."

commission of a crime would disqualify even though there had been no criminal prosecution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible" (citations omitted). Id. In Howard v. Chief of Police of Wakefield, 59 Mass. App. Ct. 901, 902 (2003), the Appeals Court upheld a finding of unsuitability based on an abuse prevention order that had expired. Moreover, in Godfrey v. Chief of Police of Wellesley, 35 Mass. App. Ct. 42, 43, 47-48 (1993), the Appeals Court upheld a finding of unsuitability based on a licensee's refusal to cooperate with a police investigation in the face of what the police chief reasonably deemed to be a continuing and serious danger to public safety, particularly young children, where police had reason to believe that a gun used to fire bullets into a school, a private residence, and an automobile might have belonged to the licensee. These cases provide adequate guidance to persons of common intelligence that conduct which is criminal and violent, regardless whether it has resulted in a criminal conviction, is grounds for denial, revocation, or suspension of a license to carry a firearm on the basis of unsuitability.

Holden's license was revoked, and his application for renewal of his license was denied, based not on a generalized, subjective determination of unsuitability, but on specific and reliable information that he had assaulted and beaten his wife.

The information on which the chief relied was the type of information on which judges rely when revoking a criminal defendant's probation.  See Commonwealth v. Durling, 407 Mass. 108, 120-122 (1990).  The punishment for assault and battery includes imprisonment of up to two and one-half years.  See G. L. c. 265, § 13A.  Had Holden been convicted of this offense, he would have been disqualified from firearm licensure.  See G. L. c. 140, § 131 (d) (i), (f).  The fact that there was no conviction removes the incident as a license disqualifier, but it does not remove the chief's consideration of the incident on the question of Holden's suitability.  Whatever ambiguities may be imbedded in the term "suitable person," our jurisprudence puts people on notice that uncharged and untried criminal conduct amounting to an assault and battery is not among them. See Deluca, 415 Mass. at 159-160; Howard, 59 Mass. App. Ct. at 902.  See also G. L. c. 140, § 121 (definition of "violent crime").  A person of common intelligence would understand that an assault and battery could render him or her unsuitable for purposes of § 131.  As applied to a Class A license holder in Holden's situation, his vagueness challenge fails.

b.  Class B license.  Practical wisdom cautions that the law of possession of firearms outside of the home is a "vast terra incognita that courts should enter only upon necessity and only then by small degree."  Hightower, 693 F.3d at 74, quoting

United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir.), cert. denied, 132 S. Ct. 756 (2011). After acknowledging that the Constitution allows "some measure [for] regulating handguns,"[9] in one of the few definitive statements in Heller, the Supreme Court said "certain policy choices [are] off the table. These include the absolute prohibition of handguns held and used for self-defense in the home" (emphasis added). Heller, 554 U.S. at 636. In the instant case we have neither an absolute prohibition of handguns in the home nor the regulation of handguns in the home. We also are not faced with an absolute ban on carrying ready-to-use firearms in public. See Moore, 702 F.3d at 940. Although the exact parameters of the Second Amendment are far from clear with respect to openly carrying firearms outside the home, and the law is similarly unsettled as to which standard of scrutiny applies, we may nevertheless engage in a meaningful analysis based on some assumptions.

To begin, if we assume that Holden had a Class B license or that he had applied for a Class B license, and if we further assume that he had an interest protected by the Second Amendment, in that context that interest would not necessarily enjoy the same level of protection as keeping and bearing a handgun for self-defense in the home, which has been

---

[9] The prefatory clause of the Second Amendment ("well regulated Militia") anticipates some regulation.

increasingly recognized as the "core" of the Second Amendment. See Hightower, 693 F.3d at 72.  We said recently that some measure of regulation is permissible even in the home "to prevent those who are not licensed to possess or carry firearms from gaining access to firearms."  McGowan, 464 Mass. at 244. In that case, we held that G. L. c. 140, § 131L (a), was "consistent with the right of self-defense in the home because it does not interfere with the ability of a licensed gun owner to carry or keep a loaded firearm under his immediate control for self-defense," but requires him to store the firearm in a locked container or apply a safety device that renders the weapon inoperable by someone who is not lawfully authorized when not being carried or kept under the direct personal control of the owner or a lawfully authorized user.  Id. at 243.  Where the Commonwealth has not totally banned the open carrying of firearms in public but has subjected such activity to licensing, the question becomes not whether any regulation is permissible under the Second Amendment but whether the particular regulation is permissible.  See Hightower, 693 F.3d at 73.

Federal Circuit Courts of Appeals that have considered the question of regulation of firearms in public have observed that historically such regulation has been more prevalent than regulation of firearms in the home, and that the right to carry in public implicates more peripheral Second Amendment concerns

than keeping and bearing arms in the home.  See, e.g., <u>Drake</u> v. <u>Filko</u>, 724 F.3d 426, 430 n.5 (3d Cir. 2013), cert. denied sub nom. <u>Drake</u> v. <u>Jerejian</u>, 134 S. Ct. 2134 (2014); <u>Kachalsky</u> v. <u>County of Westchester</u>, 701 F.3d 81, 96 (2d Cir. 2012), cert. denied sub nom. <u>Kachalsky</u> v. <u>Cacace</u>, 133 S. Ct. 1806 (2013); <u>Hightower</u>, 693 F.3d at 72; <u>Masciandaro</u>, 638 F.3d at 470.  A majority of those courts has applied intermediate scrutiny to laws regulating firearms in public because the regulating authority did not totally prohibit carrying firearms in public and because the right to carry a firearm in public was not at the core of the Second Amendment.  See <u>Drake</u>, <u>supra</u> at 436; <u>Woollard</u> v. <u>Gallagher</u>, 712 F.3d 865, 876 (4th Cir.), cert. denied, 134 S. Ct. 422 (2013); <u>Kachalsky</u>, <u>supra</u> at 93-96. Compare <u>Hightower</u>, <u>supra</u> at 74 (plaintiff's "claim fails whatever standard of scrutiny is used").  Under intermediate scrutiny the question is whether the challenged statute is "substantially related to an important governmental objective." <u>Clark</u> v. <u>Jeter</u>, 486 U.S. 456, 461 (1988).  See <u>Brackett</u> v. <u>Civil Serv. Comm'n</u>, 447 Mass. 233, 246 (2006).

The governmental objective here has been stated variously as the promotion of public safety by "limit[ing] access to deadly weapons by irresponsible persons," <u>Ruggiero</u>, 18 Mass. App. Ct. at 258; assuaging "the societal concern with weapons reaching the hands of unauthorized users," <u>Jupin</u> v. <u>Kask</u>, 447

Mass. 141, 154 (2006); and "prevent[ing] the temptation and the ability to use firearms to inflict harm, be it negligently or intentionally, on another or on oneself."  Commonwealth v. Lee, 10 Mass. App. Ct. 518, 523 (1980).  General Laws c. 140, § 131, "was enacted as a first-line measure in the regulatory scheme," arising from the obvious and unassailable "realization that prevention of harm is often preferable to meting out punishment after an unfortunate event."  Ruggiero, supra at 258-259.  The Supreme Court has recognized that the government interest in public safety is both "compelling," United States v. Salerno, 481 U.S. 739, 745 (1987), and "significant."  Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 376 (1997).  The Commonwealth's interest in firearms control regulation is of the "utmost importance, as the statute governing who may lawfully carry a firearm directly affects the physical safety of the citizenry."  Dupont v. Chief of Police of Pepperell, 57 Mass. App. Ct. 690, 693 (2003).

The suitable person standard in G. L. c. 140, § 131 (d) and (f), is substantially related to these important governmental interests.  As the Attorney General explained in 1926, this standard ensures that "the traffic of firearms shall be exposed to the scrutiny of the proper authorities and that criminals and irresponsible persons shall be unable to obtain firearms easily."  Rep. A.G., Pub. Doc. No. 12, at 160 (1926).  That

purpose remained essentially unchanged nearly forty years later, when the Attorney General stated: "the intent of the General Court is to have local licensing authorities employ every conceivable means of preventing deadly weapons in the form of firearms coming into the hands of evildoers." Rep. A.G., Pub. Doc. No. 12, at 233-234 (1964). That purpose remains firm today. As one Federal District Court judge observed about the Connecticut counterpart to the suitable person standard in G. L. c. 140, § 131 (d) and (f): "it is impossible for the [L]egislature to conceive in advance each and every circumstance in which a person could pose an unacceptable danger to the public if entrusted with a firearm." Kuck v. Danaher, 822 F. Supp. 2d 109, 129 (D. Conn. 2011). That standard, with "circumscribed discretion," was deemed to be constitutional. Id.

As discussed above with respect to the discussion of the Class A license, there is nothing vague about the application of the suitable person standard to Holden's circumstances. There has been no showing that the chief's decision was arbitrary or capricious. And there has been no showing of heavy-handedness on the part of the chief. To the contrary, the District Court judge found after an evidentiary hearing that in approximately six years since 2006, the chief granted approximately 3,200

applications for licenses to carry and denied or suspended approximately 200 such applications and licenses.

As previously discussed, Holden's conduct in punching his wife in the face, dragging her out of his vehicle, and throwing her to the ground constitutes criminal conduct that would have disqualified him from licensure had he been convicted. The absence of a conviction does not prevent such conduct from consideration by the chief on the question of Holden's suitability. Holden's acts of domestic violence provide precisely the kind and quality of evidence that rationally support a finding of unsuitability. The suitability standard works in tandem with the disqualifying provisions of the statute to reasonably prevent lethal firearms from falling into the hands of persons likely to misuse them. This standard is substantially related to the Commonwealth's important interests in promoting public safety and preventing violence. For these reasons Holden's as-applied challenge fails.

3. Facial challenge. Holden's facial challenge, on Second Amendment grounds, focuses on the discretion conferred by the "suitability" requirement. He contends that G. L. c. 140, § 131 (d) and (f), is unconstitutionally vague on its face because it confers excessive discretion in determinations of suitability. Holden maintains that the statute permits determinations of unsuitability that are inherently subjective. For his facial

attack to succeed Holden "would have to establish 'that no set of circumstances exists under which [the suitability standard] would be valid,' United States v. Salerno, 481 U.S. at 745, or that the statute lacks any 'plainly legitimate sweep,' Washington v. Glucksberg, 521 U.S. 702, 740 n.7 (1997)." United States v. Stevens, 559 U.S. 460, 472 (2010). Although which of these standards controls is a question that is unresolved, see id., Holden's challenge fails under both.

A "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." United States v. Williams, 553 U.S. 285, 304 (2008). "[E]ven when the outer boundaries of a law are imprecise, such imprecision does not permit a facial attack on the entire law by one whose conduct 'falls squarely within the "hard core" of the [law's] proscriptions.'" Commonwealth v. Orlando, 371 Mass. 732, 734 (1977), quoting Broadrick v. Oklahoma, 413 U.S. 601, 608 (1973). As discussed supra, people of common intelligence are on notice that uncharged and untried criminal conduct amounting to an assault and battery may render someone unsuitable for purposes of G. L. c. 131, § 131 (d) and (f). Holden's domestic abuse of his wife falls squarely within the hard core of the suitability standard, and it renders him unsuitable to carry firearms in public. Because Holden's as-applied vagueness challenge fails, his

facial vagueness challenge necessarily fails both standards identified in Stevens.  See Hoffman Estates, 455 U.S. at 497.  See also Hightower, 693 F.3d at 76-80.

Holden also makes a facial challenge based on the overbreadth doctrine.  Under this doctrine a law may be invalidated under the First Amendment "as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" Stevens, 559 U.S. at 473, quoting Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449 n.6 (2008).  We need not dwell on this point because "every court to have expressly considered the issue" has rejected the applicability of the overbreadth doctrine in the context of the Second Amendment (citations omitted).  Hightower, 693 F.3d at 81-83 (citations omitted).  The reason for this is that the Supreme Court has recognized facial attacks alleging overbreadth in limited circumstances that do not include the Second Amendment context.  See id. at 82.  Holden's facial attack fails.

4.  Due process.  Holden raises a number of procedural due process claims that we now address.  First, he claims that G. L. c. 140, § 131 (f), is flawed because it does not provide for a prerevocation or presuspension hearing before the licensing authority.  Generally, such a hearing is required, but not always.  The Supreme Court has recognized that "on many

occasions . . . where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirement of the Due Process Clause." Gilbert v. Homar, 520 U.S. 924, 930 (1997). "Protection of the health and safety of the public is a paramount governmental interest which justifies administrative action. Indeed, deprivation of property to protect the public health and safety is '[one] of the oldest examples' of permissible summary action." Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 300 (1981), quoting Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599 (1950). The Court has "traditionally accorded the [S]tates great leeway in adopting summary procedures to protect public health and safety." Mackey v. Montrym, 443 U.S. 1, 17 (1979). In such circumstances, full predeprivation process is not required, provided "prompt postdeprivation review is available for correction of administrative error." Id. at 13. We conclude that revocation of a license to carry without a predeprivation hearing is justified by concerns of public health and safety. See Kuck v. Danaher, 600 F.3d 159, 166 (2d Cir. 2010); Rabbitt v. Leonard, 36 Conn. Supp. 108, 111, 115-116 (1979).

General Laws c. 140, § 131 (f), provides that an "applicant or holder aggrieved by a denial, revocation or suspension of a license . . . may, within . . . 90 days after receiving notice

of such denial, revocation or suspension . . . , file a petition to obtain judicial review in the district court having jurisdiction. . . . A justice of such court, after a hearing, may direct that a license be issued or reinstated to the petitioner if such justice finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same." The Appeals Court has interpreted the statute to require an evidentiary hearing. See Godfrey, 35 Mass. App. Ct. at 44-45; Chief of Police of Shelburne v. Moyer, 16 Mass. App. Ct. 543, 547 (1983). Section 131 (f) affords prompt, comprehensive postdeprivation review. Contrary to Holden's assertion, unsupported by any authority, a District Court judge is not limited to review of an administrative record established by the summary action of the licensing authority. In this respect, review under § 131 (f) is broader than review under G. L. c. 30A, § 14. An aggrieved person may present relevant evidence tending to show that he or she is a proper person to hold a license to carry a firearm, or that the action of the licensing authority was arbitrary or capricious, or an abuse of discretion. Moyer, supra at 546. Indeed, the evidentiary hearing in this case was extensive, and new evidence was offered.

Holden contends that the burden of proof in cases under G. L. c. 140, § 131 (f), shifted from the applicant or the license holder to the licensing authority as a result of the Supreme Court's decision in McDonald, 561 U.S. at 791, which made Heller applicable to the States. His reliance on Highland Tap of Boston, Inc. v. Boston, 26 Mass. App. Ct. 239, 244 (1988), is misplaced. That was a case involving the First Amendment, and we see no reason to extend the holding in the Highland Tap decision beyond the facts of that case. Significantly, the Supreme Court has said that "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of [F]ederal constitutional moment." Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 58 (2005), quoting Lavine v. Milne, 424 U.S. 577, 585 (1976). As the United States Court of Appeals for the First Circuit said on precisely this issue, "[t]he Massachusetts legislature could have reasonably concluded that, on review in the district court, the burden should be placed on the aggrieved individual, who would be in the best position to present relevant evidence as to the suitability requirement." Hightower, 693 F.3d at 87. For example, Holden could have shown (but did not here) that he benefited from any number of therapies, such as marital counselling, anger management, or psychiatric or psychological counselling, in which he

successfully addressed whatever issues gave rise to the domestic abuse that resulted in the finding of his unsuitability.  See, e.g., G. L. c. 140, § 131 (d) (ii), (iii) (allowing persons confined for mental illness or treated for substance abuse to present affidavit of physician indicating person is no longer disabled, or is cured).[10]

Holden next argues that the chief's reliance on hearsay evidence, both in his summary actions and in his testimony at the evidentiary hearing, violates due process.  In particular, Holden contends he was deprived of the right to be heard "at a meaningful time and in a meaningful manner."  Armstrong v. Manzo, 380 U.S. 545, 552 (1965).  The hearsay evidence on which the chief relied was reliable and relevant, and it was the kind and quality of evidence on which judges often rely in probation revocation hearings.  See Durling, 407 Mass. at 120-122.  The chief testified, and he was subjected to lengthy cross-examination.  The police officer who responded to the domestic abuse call testified to what he observed about the condition of Holden's wife, as well as the information he received from

---

[10] General Laws c. 140, § 131 (d) (ii) and (iii), was amended by St. 2014, c. 284, § 48, effective January 1, 2015. Section (d) (iii) now provides in part that a person committed for mental illness or alcohol or substance abuse may, after five years from the date of confinement, submit the affidavit of a licensed physician or clinical psychologist stating that the person is not disabled in a manner that shall prevent the applicant from possessing a firearm, rifle, or shotgun. Reference to the statute should be had for further details.

Holden's wife and daughter. He, too, was cross-examined. "The full panoply of procedures usually available at a trial is not required in the review by a District Court in a case of this nature. The hearsay rule should not be applied to evidence proffered by a chief of police in support of the reasonableness of his denial. The test should be one of relevance." Moyer, 16 Mass. App. Ct. at 547. We discern nothing in the proceedings before the District Court to suggest that Holden did not receive a hearing conformably within the requirements of due process.

Holden's final claim is a reassertion of the argument that the suitability standard permits unbridled discretion. For reasons previously stated, we reject this claim.

5. Current cause. Holden argues that, as a matter of substantive due process, the chief must show that he is currently unsuitable, and that the chief's 2006 policy impermissibly transforms the domestic abuse incident in question into a permanent disqualification. Compare Commonwealth v. Bruno, 432 Mass. 489, 503 (2000) (commitment of person as sexually dangerous person turns on his "current mental condition"); Acting Supt. of Bournewood Hosp. v. Baker, 431 Mass. 101, 105 (2000) ("aspect of immediacy of harm [in context of civil commitment proceeding] arises from the imminency of discharge as well as from the mental illness"); Hill, petitioner, 422 Mass. 147, 154, cert. denied sub nom. Hill v.

Massachusetts, 519 U.S. 867 (1996) (continued commitment of person as sexually dangerous requires proof that he is "still sexually dangerous").

Although the chief denied Holden's application five years after the domestic abuse incident, the basis for denial on the ground of unsuitability was Holden's "violent proclivities, anger management issues and poor decision-making." Based on the chief's twenty-seven-year career as a police officer as of the time he denied Holden's application in 2010, and based on published estimates that suggest the recidivism rate among domestic abusers ranges from forty per cent to eighty per cent, "implying that there are substantial benefits in keeping the most deadly weapons out of the hands" of abusers, a period of five years following an incident of domestic abuse without professional intervention is hardly stale evidence. United States v. Skoien, 614 F.3d 638, 644 (7th Cir. 2010), cert. denied, 131 S. Ct. 1674 (2011). See United States v. Booker, 644 F.3d 12, 26 (1st Cir. 2011), cert. denied, 132 S. Ct. 1538 (2012) ("Statistics bear out the Supreme Court's observation that '[f]irearms and domestic strife are a potentially deadly combination nationwide,'" quoting United States v. Hayes, 555 U.S. 415, 427 [2009]). We cannot say that the passage of five years from Holden's domestic abuse of his wife, without incident, automatically precluded the chief from relying on the

incident of September 10, 2005, when he denied Holden's application on November 18, 2010.  Had Holden been convicted of assault and battery, that conviction would have disqualified him from licensure permanently.  See G. L. c. 140, § 131 (d) (i). We are not prepared to determine, on this record, what period of time must pass before the chief may no longer consider that event.  We note that it is within Holden's grasp to seek appropriate professional evaluation, and, if necessary, treatment, and provide the appropriate documentation to the chief to alleviate his legitimate concerns about Holden's unsuitability.

We offer no opinion about the validity of the chief's 2006 policy,[11] but the issue concerning the application of that policy was correctly disposed of by the Superior Court judge when he concluded that there was no evidence that the chief relied on it in his denial of Holden's application.  We are satisfied that the chief's determination of Holden's unsuitability was based on current evidence.

6.  Substantial evidence.  We are also satisfied that the decisions of the chief were based on substantial evidence.  The judgment of the Superior Court is affirmed.

So ordered.

---

[11] Although not part of the record in this case, the chief states in his brief that the 2006 policy is no longer in effect.