APPEALS COURT 
 
 CHIEF OF POLICE OF SOUTHBOROUGH vs. PAUL A. DWIGGINS & others[1]

 
 Docket:
 23-P-1474
 
 
 Dates:
 September 17, 2024 – April 2, 2025
 
 
 Present:
 Rubin, Desmond, & Singh, JJ.
 
 
 County:
 Worcester
 

 
 Keywords:
 Firearms. License. Practice, Civil, Judgment on the pleadings, Judicial review of license to carry firearms, Action in nature of certiorari.
 
 

       Civil action commenced in the Superior
Court Department on July 7, 2021. 
      The case was heard by James M. Manitsas,
J., on a motion for judgment on the pleadings.
Jason R. Talerman
for the plaintiff.
Sydney C. Sheerin
for Paul A. Dwiggins.
      RUBIN, J. 
This case involves the denial by the chief of police of Southborough
(chief) of a resident class A large capacity license to carry firearms.  A judge of the District Court reversed the
chief's determination, a decision that was affirmed by a judge of the Superior
Court.  The chief has now appealed, and
we reverse and reinstate the chief's original decision.
      Background.  On September 2, 2020, the chief denied to
Paul A. Dwiggins (applicant) a resident class A large capacity license to carry
firearms under G. L. c. 140, § 131, on grounds that he was
"unsuitable" to obtain such a license.  The statute has been amended subsequently,
but at the time that the judge denied the application at issue here, G. L.
c. 140, § 131 (d), as amended through St. 2018, c. 123,
§§ 11, 12, in relevant part, read 
"[a]
determination of unsuitability shall be based on:  (i) reliable and credible information
that the applicant or licensee has exhibited or engaged in behavior that
suggests that, if issued a license, the applicant or licensee may create a risk
to public safety; or (ii) existing factors that suggest that, if issued a
license, the applicant or licensee may create a risk to public safety."
      The evidence on which the chief relied
identified over eighty police contacts, all negative, with either the
applicant's son or wife over the previous fourteen years.  Many were for incidents of domestic violence
at the applicant's house.  Many of these
contacts were for mental health crises involving the applicant's wife.  
      Among the police reports on which the
chief relied were two reports of an event in which the applicant's fifteen year
old son, an individual with a serious substance abuse history who also was
reported by the wife, his mother, to be a drug dealer, had come home drunk and
gotten into a dispute with the applicant.
      According to the police reports, the
witnesses said different things had occurred. 
The applicant said that his son had come home drunk and had become
combative after the applicant told him he could not have a sleepover.  The applicant said the son had pushed him
hard.  The son, by contrast, said that
the applicant had grabbed him first.  The
applicant said the son picked up a kitchen knife.  The applicant and the wife told police that
the son then said that "he was going to go to his room and hold the knife
to his throat so if his mother wanted to kill him he would make it easier for
her."  The applicant said he knocked
the knife out of the son's hands.
      Another police report involved a separate
incident, also involving a knife, in which the son, after a physical
altercation with his brother, picked up a knife and threatened to kill his
brother.  The police arrested the son,
and while in custody, the son stated that he wanted to commit suicide by
shooting himself with a firearm.
      Another police report involved an arrest
of the applicant's wife due to her dangerous driving.  The wife initiated contact with a police
officer, who was directing traffic, by pulling up next to him in her car,
rolling down her window, and yelling, "Hey, have you seen my son, he's a
drug dealer . . . ." 
The officer asked her to pull to the side of the road so they could
speak about her missing son, and the wife responded by screaming profanities at
the officer and threatening to sue him. 
She then sped off, swerving as she drove, nearly colliding with several
people walking along the road.  Other
officers followed the wife in their cruisers, eventually pulling her over.  When they informed her that she was under
arrest, she continued screaming obscenities at the officers and refused to exit
her vehicle.  Throughout the officers'
effort to arrest her, she remained combative, kicking one of the officers at
one point and continuing to scream profanities at them.  When the officers finally brought the wife to
the police station for the booking process, the wife threatened one of the
officers, saying, "If I had a gun right now I would blow your head right
off."  
      Another police report detailed an incident
where the wife was involuntarily hospitalized under G. L. c. 123,
§ 12, due to her mental health.  
      There were also multiple police reports
responding to incidents related to both the son's and the wife's use of alcohol
and other substances.  During one of
these encounters, the police attempted to place the son in protective custody
so they could transport him to the hospital due to his severe
intoxication.  The son ran from the
responding officer and became violent. 
Once the responders managed to get the son into an ambulance to
transport him, he remained so aggressive that the ambulance personnel had to
sedate him.
      In the chief's notice to the applicant
denying his application for a license, the chief noted that he was deeming the
applicant an unsuitable person to obtain a license for the following
reasons:  "Persons residing in your
household with histor[ies] of substance abuse, criminal behavior, and mental
health issues.  After a review of the
involved police reports, I have found you to be unsuitable."  
      Proceedings below.  The applicant filed a petition for judicial
review in the Westborough Division of the District Court Department, pursuant
to G. L. c. 140, § 131 (f). 
A judge of that court reversed the chief's decision.  At the evidentiary hearing the judge said,
"[The
chief's decision was] not capricious and [was] not whimsical.  It's based on good reason.  The problem is I don't know that the law in
Massachusetts would support that as it currently is.  And maybe it needs to be appealed so that it
does get changed . . . . 
So boy, if I was the chief, I'd do what he did here.  I just don't know whether or not I'm able to
deny a petition under these circumstances, given the state of the law in
Massachusetts."
In his decision
reversing the chief's determination, the District Court judge wrote, 
"The valid
public safety concerns cited by Chief Paulhus do not reflect on conduct by the
petitioner.  Although the household
circumstances were chaotic and posed risk to police officers, firefighters, and
medical personnel, none of the incidents were caused by or engaged in with the
petitioner.  The law as currently written
restricts the determination of unsuitability to the actions, conduct, and
history of the person who applies for the license.  Nothing cited by Chief Paulhus reflects
directly on any actions or behavior by Mr. Dwiggins, the petitioner."
      The chief appealed that decision to the
Superior Court by complaint for certiorari review, see G. L. c. 249,
§ 4.  A judge of that court entered
judgment on the pleadings, concluding that "the matters relied upon by
Chief [Paulhus] do not reflect upon Dwiggins's conduct" and thus were not
permissible criteria for making a determination of unsuitability under
G. L. c. 140, § 131 (d). 
The chief has now brought this appeal.
      Discussion.  The only question at issue before us is the
meaning of the statute at the time the chief rendered his decision.[2]  At that time, G. L. c. 140,
§ 131 (d), as amended through St. 2018, c. 123, §§ 11, 12,
in relevant part, read 
"[a]
determination of unsuitability shall be based on:  (i) reliable and credible information
that the applicant or licensee has exhibited or engaged in behavior that
suggests that, if issued a license, the applicant or licensee may create a risk
to public safety; or (ii) existing factors that suggest that, if issued a
license, the applicant or licensee may create a risk to public
safety."  
We recognize that
subsection (ii) has now been eliminated as part of the Legislature's rewriting
of the statute in 2022, see G. L. c. 140, § 131, as amended
through St. 2024, c. 135, § 49, and that, therefore, our decision is
one that will have very limited application. 
Nonetheless, that is the version of the statute under which the chief
made his decision and under which that decision must be reviewed.
      Suitability is about safety, and a
determination of unsuitability implies no moral judgment or guilty conduct on
the part of the applicant.  See, e.g.,
MacNutt v. Police Comm'r of Boston, 30 Mass. App. Ct. 632, 634-635 (1991)
(person may be found unsuitable if person does not safely handle firearm during
and pass firing test requiring that "firing regimen be followed and
accuracy demonstrated").  A court
may disturb the chief's determination that the applicant might create a risk to
public safety only if it amounted to an abuse of discretion, was arbitrary and
capricious, or otherwise not in accordance with law.  See Chief of Police of Wakefield v. DeSisto,
99 Mass. App. Ct. 782, 784 (2021), quoting Nichols v. Chief of Police of
Natick, 94 Mass. App. Ct. 739, 744 (2019). 
"In considering whether an applicant should be granted a license or
a renewal thereof under § 131, the licensing authority has been given
'considerable latitude.'"  Godfrey
v. Chief of Police of Wellesley, 35 Mass. App. Ct. 42, 46 (1993), quoting
Ruggiero v. Police Comm'r of Boston, 18 Mass. App. Ct. 256, 259 (1984).  See MacNutt, 30 Mass. App. Ct. at 635.
      The applicant argues before us that the
chief's determination in this case was unlawful, because the determination of
unsuitability had no basis in the applicant's own prior behavior and that if
that behavior does not indicate that licensing him would create a risk to
public safety, he may not be denied a license.
      The statute, however, contains two
subsections.  Although in light of our
reliance on subsection (ii), see infra, we need not construe it here,
subsection (i) of the language quoted above might be read to indicate that a
determination of unsuitability thereunder may be based only on evidence about
behavior exhibited or engaged in by an applicant.[3]  Subsection (ii) -- eliminated from the
current version of the statute -- however, does not include any such
limitation.[4]  Rather, it says that,
beyond subsection (i), unsuitability may be based on "existing
factors."  Even though it may be, as
our dissenting colleague indicates, that denials under the statute
"generally hinge on whether the applicants or licensees themselves pose a
risk to public safety," post at   ,
subsection (ii) allows consideration of existing factors broader than the
applicant's prior behavior or conduct. 
Cf. post at   ("Although the
term 'existing factors' is undoubtedly nebulous, I agree with each of the
judges below that the statute's sole concern is the suitability of the
applicant").
      As to subsection (i), the applicant argues
that there is no evidence of conduct or behavior of his that could support a
finding of unsuitability.  We note,
however, that the police reports on which the chief relied in finding the applicant
unsuitable do include evidence of the applicant's own behavior.  The applicant was involved in at least one
incident of domestic violence in his home. 
In the first incident described above, the son stated that the applicant
had in fact grabbed him before the son pushed the applicant and grabbed a
kitchen knife.  By the applicant's own
admission, he knocked that knife out of the son's hands.  The applicant thus did confront a family
member wielding a deadly weapon and disarmed him by using physical force.  The record with respect to this incident is
thin -- the administrative record contains no more details about what actually
happened in that incident, nor are there findings of fact on the matter from
the District Court.  But whatever the
strength of the case for denial of the license under subsection (i), because
the application was permissibly denied under subsection (ii), we need not and
do not decide the issue.
      As to subsection (ii), without any
reference to the behavior of the applicant, it states that unsuitability can be
found if there are "existing factors that suggest that, if issued a
license, the applicant or licensee may create a risk to public
safety."  G. L. c. 140,
§ 131 (d), as amended through St. 2018, c. 123, §§ 11,
12.  In this case, the existing factors
relevant to public safety aside from the applicant's conduct include the past
domestic violence in the household and the serious mental health issues
presented by the applicant's wife, who resides with him.  Indeed, both the son and the wife separately
threatened to do violence with a firearm if only they had one.  Given the language of subsection (ii), it was
not impermissible for the chief to have taken these into account.  The question before the chief was whether,
given these factors, the applicant, if licensed, "may create a risk to
public safety," in this case, by bringing a firearm into the
residence.  Id.  The chief was within his authority when he
determined the applicant may create such a risk by bringing a firearm into the
volatile, unstable, and violent environment of his residence, to which multiple
police responses for domestic violence, substance use, and mental health have
been required year after year after year.
      This is not, as our dissenting colleague
puts it, an "unsuitability determination . . . based on the
conduct of third parties" that is imputed to the applicant.  Post at  
.  The "existing factor"
is not merely the conduct of the wife and son. 
It is the danger presented by the environment into which the applicant
will bring the firearm.  The chief's
conclusion of unsuitability is a determination that the applicant is unsuitable
because of the serious risk of harm created by his bringing the firearm into
and storing it at a volatile, violent, and dangerous place.
      We may disturb the chief's determination
that the applicant might create a risk to public safety only if it amounted to
an abuse of discretion or was arbitrary and capricious.  See DeSisto, 99 Mass. App. Ct. at 784, quoting
Nichols, 94 Mass. App. Ct. at 744.  We
conclude that it was neither.  Indeed, we
agree with the District Court judge below who noted that the chief looked at
"valid public safety concerns," and with the Superior Court judge
below who found that "there may be some wisdom in Chief Paulhus'
concerns."
      The judgment of the Superior Court is
reversed, and a new judgment shall enter affirming the denial of Dwiggins's
license to carry.[5]
So ordered.
      DESMOND, J. (dissenting).  The majority concludes that the statute
permits a finding that the applicant is "unsuitable" to obtain a
firearms license because "existing factors," identified as the
criminal behavior, substance use history, and mental health issues exhibited by
the applicant's wife and son, suggest that the applicant "may create a
risk to public safety" by bringing a firearm into his residence.  I respectfully disagree, concluding that
there has been an insufficient showing that the applicant himself poses a risk
to public safety and, therefore, that he cannot be found unsuitable under the
statute.
      On review of a denial of a license, a
judge of the District Court may direct the licensing authority to issue a
license only upon a finding that that the "licensing authority had 'no
reasonable ground' for denying the license."  Chief of Police of Taunton v. Caras, 95 Mass.
App. Ct. 182, 185 (2019), quoting Nichols v. Chief of Police of Natick, 94
Mass. App. Ct. 739, 744 (2019).  Such a
finding "is warranted only upon a showing by the applicant that the
licensing authority's refusal [to grant . . . the license] was
arbitrary, capricious, or an abuse of discretion" (quotation and citation
omitted).  Nichols, 94 Mass. App. Ct. at
744.  "On appeal . . . we
apply the same standard of review as the Superior Court judge . . .
[and] [o]ur role is to examine the record of the District Court and to correct
substantial errors of law apparent on the record adversely affecting material
rights" (quotations and citations omitted).  Caras, 95 Mass. App. Ct. at 185-186.
      Here, I discern no errors of law on the
record and would affirm the Superior Court judge's decision for the following
two reasons.  First, I respectfully
disagree with my learned colleagues that "existing factors" can
include the independent conduct of current and former members of the
applicant's household.  As written, the
statute focuses on the unsuitability of the applicant or licensee:
"A
determination of unsuitability shall be based on:  (i) reliable and credible information
that the applicant or licensee has exhibited or engaged in behavior that
suggests that, if issued a license, the applicant or licensee may create a risk
to public safety; or (ii) existing factors that suggest that, if issued a
license, the applicant or licensee may create a risk to public safety" (emphasis
added).
G. L.
c. 140, § 131 (d), as amended through St. 2018, c. 123,
§§ 11, 12.  While subsection (i)
focuses on the applicant's past behavior, the "existing factors"
language in subsection (ii) serves as a catchall for other "factors"
that might render applicants themselves unsuitable.  Although the term "existing
factors" is undoubtedly nebulous, I agree with each of the judges below
that the statute's sole concern is the suitability of the applicant.  See Garcia v. Steele, 492 Mass. 322, 326
(2023) (specific language within statutory provision must be considered
"in the context of the statute as a whole").  Furthermore, as both judges identified, cases
upholding the licensing authority's decision to revoke or deny a firearms
license based on an applicant's or licensee's unsuitability generally hinge on
whether the applicants or licensees themselves pose a risk to public
safety.  See Chief of Police of Worcester
v. Holden, 470 Mass. 845, 855-856 (2015), and cases cited therein.  See also Chief of Police of Wakefield v.
DeSisto, 99 Mass. App. Ct. 782, 785 (2021) (affirming Superior Court judgment
upholding chief's unsuitability determination where applicant had history of
illicit use and distribution of controlled substances); Caras, 95 Mass. App.
Ct. at 187 (holding chief's decision revoking firearms license "should not
have been disturbed" where licensee failed to secure firearm in his
vehicle, enabling person with known substance use disorder to steal it).  The discretion of the licensing authority is
not unlimited, and I find no case law suggesting that an unsuitability
determination can be based on the conduct of third parties.[1]
      I also share the reticence of the District
Court judge to impute the conduct of third parties onto the suitability of an
applicant and have concerns that an effect of the majority's decision is to
allow applicants to be deemed unsuitable by association.  However, I recognize that the majority's
decision is of limited application given that the Legislature has since removed
the "existing factors" language from the statute.[2]
      Second, assuming without deciding that
"existing factors" can encompass the conduct of third parties such as
members of an applicant's household, I do not agree with the majority that this
applicant might "create a risk to public safety" simply by exercising
his right to lawfully bring a firearm into his own residence.  The majority holds that a risk to public
safety would potentially arise in this case if either the applicant's wife or
son gained access to the weapon.  This
could happen only under a few limited circumstances.  For example, the applicant could unlawfully
give his wife or son access to the firearm or otherwise unlawfully store the
firearm, thereby allowing his wife or son to gain access to the weapon.  Conversely, if the applicant lawfully stored
his weapon in a "locked container accessible only to the [applicant] or
other lawfully authorized user,"[3] his wife or son could nevertheless
obtain the firearm by unlawfully breaking into the applicant's gun safe, or
physically taking the weapon from the applicant's person against his will.  The record before us does not support the
former scenario, as there is no evidence from any source that the applicant
would act unlawfully, and any risk to public safety created by the latter
scenario would be due to the unlawful behavior of the applicant's wife or son,
and, in my view, cannot be attributed to the applicant.[4]
      In fact, subsection (ii) explicitly bases
a determination of unsuitability on "existing factors that suggest that,
if issued a license, the applicant or licensee may create a risk to public
safety" (emphasis added). 
G. L. c. 140, § 131 (d), as amended through St.
2018, c. 123, §§ 11, 12.   As a
result, the police chief must not simply consider whether issuing a license to
a given applicant might create a risk to public safety; rather, the statute
affirmatively requires the applicant to be the source of the risk.  Accordingly, where there is no record support
for a conclusion that the applicant would be an irresponsible or unlawful gun
owner, I cannot ascribe the source of the risk to the applicant.
      While I too believe that there is some
wisdom in the chief's public safety concerns, a plain reading of the statute
leaves me unpersuaded that the majority's interpretation of its language is
correct.  As such, I respectfully
dissent.

footnotes

[1] The justices
of the Westborough Division of the District Court Department.  The justices did not submit a brief in this
appeal.

[2] No question
involving the Second Amendment to the United States Constitution has been
raised or addressed at any point in this case.

[3] "A
determination of unsuitability shall be based on:  (i) reliable and credible information that
the applicant or licensee has exhibited or engaged in behavior that suggests
that, if issued a license, the applicant or licensee may create a risk to
public safety . . . ."

[4] "A
determination of unsuitability shall be based on:  . . . . (ii) existing factors
that suggest that, if issued a license, the applicant or licensee may create a
risk to public safety."

[5] The
applicant's request for attorney's fees is denied.

footnotes for dissenting

[1] While the
majority relies on the applicant’s decision to disarm his teenage son as
evidence of the applicant’s own conduct, I fail to see how the applicant’s
attempt to prevent violence in his home could render him unsuitable under the
statute.  

[2] While the
version of the statute we are reviewing certainly vests the chief of police
with broad discretion, I do not believe it extends this far.  I have concerns that permitting the chief of
police to focus on the conduct of third parties allows improper biases to
infect the enforcement of the statute and ultimately has disproportionate
impact on applicants from historically underrepresented groups.

[3] G. L.
c. 140, § 131L (a) (imposing requirement that firearms be
"secured in a locked container or equipped with a tamper-resistant
mechanical lock or other safety device" accessible only to owner or other
lawfully authorized user).

[4] It is
noteworthy that the applicant is now essentially prohibited from obtaining
employment in law enforcement, or any other profession that requires a firearms
license, because of the conduct of his family members.