SUPREME JUDICIAL COURT 
 
 IN THE MATTER OF J.P. / IN THE MATTER OF E.S.

 
 Docket:
 SJC-13492 / SJC-13493
 
 
 Dates:
 April 3, 2024 - September 17, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.
 
 
 County:
 Bristol / Essex
 

 
 Keywords:
 Practice, Civil, Civil commitment, Standard of proof. Due Process of Law, Commitment, Substantive rights, Standard of proof, Vagueness of statute. Statute, Construction. Words, "Chronic," "Habitual."
 
 

             Petition for commitment for alcohol or substance use disorder filed in the Bristol County Division of the Juvenile Court Department on May 1, 2023.
            The case was heard by Michaela C. Stewart, J.
            The Supreme Judicial Court granted an application for direct appellate review.
            Petition for commitment for alcohol or substance use disorder filed in the Essex County Division of the Juvenile Court Department on April 13, 2023.
            The case was heard by Kerry A. Ahern, J.
            The Supreme Judicial Court granted an application for direct appellate review.
            Cara M. Cheyette for the juveniles.
            Karen Owen Talley, Committee for Public Counsel Services, & Lauren E. Russell, for Committee for Public Counsel Services & another, amici curiae, submitted a brief.
            Andrea Joy Campbell, Attorney General, Konstantin Tretyakov, Nathaniel J. Hyman, & Arjun K. Jaikumar, Assistant Attorneys General, for the Attorney General, amicus curiae, submitted a brief.
            GAZIANO, J.  In each of these two cases, paired for our consideration on appeal, a concerned mother petitioned the Juvenile Court to commit involuntarily her child pursuant to G. L. c. 123, § 35 (§ 35), to receive inpatient care for drug use.  The two matters came before separate Juvenile Court judges.  After a commitment hearing was held in each case, the first juvenile, E.S., was ordered to be committed for ninety days, while the second juvenile, J.P., was ordered to be committed for thirty days.  Both juveniles appealed from their commitment orders, and we granted their applications for direct appellate review.
            On appeal, the juveniles challenge the constitutionality of § 35 in two ways:  first, they argue that the statute violates substantive due process because it does not require that clinical evidence support an order of commitment and, second, they argue that the statute's definition of a substance use disorder is void for vagueness.  Both juveniles also challenge the sufficiency of the evidence justifying their respective civil commitments.  
            We conclude that the statute is constitutional.  So long as clinical evidence supports a finding that a respondent has a substance use disorder, § 35 complies with the requirements of substantive due process.  Further, because the Legislature has provided adequate guidance in assessing whether a juvenile's substance use is "chronic" or "habitual," the two words used in the statute to define a substance use disorder and at issue here, the statute is not void for vagueness.  Turning to the commitments of the two juveniles, while the evidence was sufficient to support the order of commitment for E.S., the same cannot be said for J.P.  Accordingly, we affirm the order of commitment for E.S. and reverse the order of commitment for J.P.[1] 
            1.  Background.  In a § 35 commitment hearing, "a statement of findings and reasons, [made] either in writing or orally on the record, is a minimum requirement" of due process (quotations omitted).  Matter of a Minor, 484 Mass. 295, 306 (2020), quoting Brangan v. Commonwealth, 477 Mass. 691, 708 (2017).  See Commonwealth v. Viverito, 422 Mass. 228, 231 n.4 (1996) ("written findings and conclusions of law greatly aid an appellate court's review of trial court actions").  Because "[t]he hearing judge is in the best position to weigh the evidence, assess the credibility of witnesses, and make findings of fact[,] a reviewing court accepts these findings unless they are clearly erroneous."  Matter of a Minor, supra at 302.  We draw upon the juveniles' hearings in reciting the salient facts and procedural history in both cases, reserving additional facts for discussion below.  
            a.  E.S.  On April 13, 2023, the mother of E.S. petitioned the Juvenile Court to commit her daughter involuntarily pursuant to § 35.  A commitment hearing was held before a Juvenile Court judge on April 18, 2023, at which E.S.'s mother and father, along with a Juvenile Court clinician who interviewed E.S., testified.  
            During the hearing, the clinician testified about E.S.'s history of drug use and the events leading up to the commitment proceedings.  Specifically, the clinician testified that E.S. began using alcohol and marijuana following her parents' separation a few years prior and that her drug use escalated over time.  In November 2022, E.S. was transferred from public school to a recovery high school[2] after she was found "pretty much passed out [drunk] in a classroom."  
            The clinician explained that the precipitating incident for the § 35 petition occurred in April 2023, when E.S. failed a drug screen after providing a urine sample to her school.  Although the recovery high school regularly screened students for substances, E.S.'s parents testified that this urine test was prompted by specific concerns about her behavior.  Several days earlier, school officials asked her parents to pick up E.S. from school because she was under the influence.  By the time her mother arrived, E.S. barely could hold her eyes open, was stumbling and dropping her cell phone, and "couldn't even walk down the stairs to the car when she was leaving the school."  The day before the failed urine test, school personnel were once again concerned that E.S. was high; she went home "clearly stumbling" and "slurring," before quickly "pass[ing] out."  
            The school failed E.S.'s urine sample for two reasons:  first, the sample tested positive for fentanyl, and second, the sample was cold, suggesting that E.S. may have swapped out the sample.[3]  Later that day, E.S.'s parents, together with personnel from her high school, staged an intervention at the school.  Faced with the choice of either voluntarily seeking inpatient treatment or being "forced" to do so, E.S. fled from the school grounds and was gone for about four days.  An unknown person dropped E.S. off at her mother's home on the morning of the hearing.
            Beyond this incident, samples of E.S.'s urine had shown "faint traces" of fentanyl on two prior occasions in the weeks leading up to her commitment hearing.  E.S. herself admitted at the hearing that she had used fentanyl three times over the previous month.[4]  E.S.'s most recent urine sample, taken the week before the hearing, tested positive for "[f]entanyl, [b]enzo, and [m]ethadone."  During the hearing, the judge twice emphasized the "toxic" nature of fentanyl.  
            E.S.'s substance use was not cabined to fentanyl -- her parents found pill capsules, wine bottles, and rolled up dollar bills with trays of white powder in their homes.  Her mother testified that she "often" smelled E.S. smoking marijuana in her room.  
            Before the commitment hearing in April 2023, E.S. never had been hospitalized for her drug or alcohol use.  However, the court clinician testified that in 2021 and 2022, E.S. twice was hospitalized to receive psychiatric care for suicidal ideation.  Following these hospitalizations, E.S. participated in extensive outpatient care programs.  The court clinician noted that, at the time of the hearing, E.S. continued to suffer from depression and posttraumatic stress disorder stemming from an incident with her father.  Both her mother and the court clinician testified to E.S.'s willingness to undergo outpatient treatment, and both explained that E.S. was strongly opposed to attending an inpatient program for substance use treatment based on her experience with her two prior hospitalizations.  In discussing outpatient programs, E.S.'s parents both testified that she had "[j]ust barely" begun working with an organization that provides services as part of a drug diversion program through the district attorney's office.  
            When asked directly by the judge whether it was her opinion that E.S. "suffers from [a] substance use disorder, but . . . does not meet the criteria of imminent likelihood of serious harm to herself currently," the clinician replied, "That's accurate."  The court clinician further opined that there were less restrictive alternatives that could work for E.S., given the "very close eyes on her" at the recovery high school.  Additionally, according to the clinician, her coworkers had been looking throughout the day of the hearing "for an appropriate [outpatient] program that ha[d] an opening, hopefully [without a] waitlist," as the clinician expressed that she would be concerned if E.S. had to wait for treatment.  Although the judge asked if any program had any openings that day, and even provided the clinician with an opportunity to step out and confirm as much with her coworkers, none was available.
            At the close of the hearing, the judge ordered the involuntary commitment of E.S. pursuant to § 35 for treatment of her substance use disorder.  In ordering the commitment, the judge found by clear and convincing evidence that E.S. had "longstanding" substance use issues.  The judge highlighted testimony about the incidents in the weeks prior to the April 2023 urine screen, the various substances found in her parents' homes, her prior hospitalizations for mental health reasons, and her multiple failed drug tests.  Turning to the risk of harm posed by E.S.'s substance use, the judge specifically distinguished Matter of a Minor, 484 Mass. at 302-303, finding that E.S. was not engaging in "normal adolescent behavior"; instead, E.S.'s substance use posed "a very imminent and very substantial risk of physical impairment or injury."  The judge additionally pointed to E.S.'s flight from her would-be intervention and raised concerns about E.S.'s safety if she was "unable to walk, unable to talk, [or] unable to maneuver stairs" while intoxicated and alone.  Finally, given the court clinician's testimony that "[e]verything has [a] waiting list of at least two weeks at this point" for intensive outpatient programs in the area, the judge concluded there was "nothing in the community" at the time of the hearing "that could meet [E.S.'s] level of needs."  Accordingly, the judge ordered the commitment of E.S. for ninety days to an inpatient care facility in Worcester.[5]
            E.S. timely appealed from the commitment order, and we granted her application for direct appellate review.
            b.  J.P.  On May 1, 2023, the mother of J.P. petitioned the Juvenile Court to commit her son involuntarily pursuant to § 35.  A commitment hearing was held before a Juvenile Court judge on May 2, 2023, at which J.P's mother and a clinician for the Juvenile Court, who previously had interviewed both J.P. and his mother, testified.  
            J.P.'s mother testified about how her son's drug use altered his behavior.  She "started to notice some changes" in 2021, with a marked decline in his behavior in the months prior to the hearing.  J.P. always "need[ed] more money" because he was "feening"[6] for his next high "at all costs."  He had told others that "he's high every day[,] that he's high out of his mind, [and] that he doesn't even know . . . what planet he's on."  After holding a job for two years, J.P. had recently quit without telling his parents.  Although J.P. was enrolled in high school, he was failing all but one class and was often late, even when he left home on time.  When at school, J.P. frequently would use the bathroom for extended periods, usually to vape nicotine.  He had been suspended twice for vaping at school.  His mother also expressed concern due to their family history of drug and alcohol abuse and had contacted an outpatient program in Fall River prior to the commitment hearing.  
            J.P.'s mother also testified that, as recently as the Friday before the hearing, she "took his keys because he was driving high [on marijuana] with kids in the car."  J.P. then did not return home for several days.  During his absence, J.P. shaved his head and drank heavily, although he attended school.  
            The court clinician opined that J.P. had a substance use disorder.  She noted that while there was concern that J.P. might be using substances beyond marijuana, "there's no evidence that that has happened."  The clinician further opined that J.P. was not a danger to himself or others on account of his substance use, although he was "not on a good track."  She testified that J.P. had no history of mental health treatment and had refused his parents' offers of mental health treatment.  The clinician did not explicitly testify to available alternatives, although J.P.'s counsel mentioned that J.P. was "amenable in a teenage way" to pursuing counseling.
            At the close of the hearing, the Juvenile Court judge ordered the involuntary commitment of J.P. for a period of thirty days to a facility in Worcester.[7]  In support, the judge found that J.P. had a substance use disorder and that a likelihood of serious harm existed due to his disorder.  After J.P. appealed from his commitment order, we granted his application for direct appellate review.
             2.  Discussion.  On appeal, the juveniles raise two due process arguments.  First, they claim that § 35 is not "narrowly tailored to further a legitimate and compelling governmental interest" because it does not require a judge's commitment order to be supported by clinical evidence.  See Commonwealth v. Weston W., 455 Mass. 24, 35 (2009).  Second, they claim that in the absence of any definitions or standards for the terms "chronic" and "habitual," which are used in the statutory definition of "substance use disorder," § 35 is rendered void for vagueness.  In the absence of any constitutional infirmity, the juveniles both contend that the evidence at their respective hearings was insufficient to support their orders of commitment.  
            Before addressing the juveniles' arguments, we first provide an overview of the process for involuntary commitment under § 35, as well as the attendant constitutional standards implicated by that process.  
            a.  Statutory and constitutional framework.  "General Laws c. 123, § 35, sets forth the requirements and procedures by which an individual may be committed involuntarily for treatment of a substance use disorder."  Matter of a Minor, 484 Mass. at 296.  By the express terms of the statute, "[a]ny police officer, physician, spouse, blood relative, guardian or court official may petition . . . any district court or any division of the juvenile court department" for a § 35 commitment order.  G. L. c. 123, § 35.  "Upon receipt of a petition, the court [must] schedule an immediate hearing and [must] issue a summons to the person sought to be committed," and may issue warrants of apprehension, to the extent necessary.  Matter of a Minor, supra.  At the hearing, the person to be committed has a right to counsel and must be examined by a "qualified physician, psychologist, or social worker."  Id.  
            To issue an order of commitment, the judge must make the following three findings by clear and convincing evidence:  (1) "the person whose commitment is sought is an individual with an alcohol or substance use disorder, as defined by [§ 35]"; (2) "there is a likelihood of serious harm as a result of the person's alcohol or substance use disorder, as defined by [§ 35]"; and (3) there are no less restrictive alternatives available, as constitutionally mandated.  Matter of a Minor, 484 Mass. at 296, 309.  Additionally, the judge must memorialize, "in writing or orally on the record, the evidence he or she credited in support of [his or her] legal conclusion[s]."  Id. at 307.  
            To the first finding under § 35, a substance use disorder is defined as
"the chronic or habitual consumption or ingestion of controlled substances or intentional inhalation of toxic vapors by a person to the extent that:  (i) such use substantially injures the person's health or substantially interferes with the person's social or economic functioning; or (ii) the person has lost the power of self-control over the use of such controlled substances or toxic vapors."
G. L. c. 123, § 35.  See Matter of a Minor, 484 Mass. at 302.  In determining whether a respondent has a substance use disorder, the judge must rely on "facts tend[ing] to show the reasons for [that] finding," where the mere "use of a substance" is, on its own, not enough.  Id. at 307.
            To the second finding, G. L. c. 123, § 1, defines a "likelihood of serious harm" as  
"(1) a substantial risk of physical harm to the person himself as manifested by evidence of, threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."  
Judges must consider "the likelihood of the harm, its imminence, its seriousness, and the nexus between the harm and the underlying substance . . . use disorder."  Matter of a Minor, 484 Mass. at 307.
            Importantly, in the juvenile context, "[w]ithout a nexus to the likelihood of serious harm resulting from a substance use disorder, . . . rebellious or difficult teenage misbehavior cannot support a petition for commitment under [§ 35]."  Matter of a Minor, 484 Mass. at 301.  Accounting for a juvenile's youth and brain development "necessarily is required as part of the fact-intensive, individualized assessment" that § 35 commitment proceedings demand.  Id. at 302.  Where it is difficult to distinguish "typical adolescent lapses in judgment or self-control from those driven by substance use disorder," a judge should "make clear that his or her decision was founded on a causal nexus between a likelihood of serious harm and substance use disorder, rather than developmentally typical adolescent misbehavior."  Id. 
            To the third finding, "due process requires a judge to consider less restrictive alternatives in all commitment hearings for substance use disorder treatment."  Matter of a Minor, 484 Mass. at 308-309.  A less restrictive alternative "need not eliminate all risk," but must be a "viable, plausibly available option[] that bring[s] the risk of harm below the statutory thresholds."  Id. at 310.  Practically, judges may seek guidance on this issue from the experts, such as social workers, "who are already required to testify in these cases."  Id.  Additionally, judges must consider the potential disruption that involuntary commitment may impose on a respondent's ongoing treatment efforts, community connections, and familial relationships.  See id.  "Particularly for juveniles, supportive relationships with family and community have been deemed protective against future substance use."  Id. 
            b.  Necessity of clinical evidence.  Both juveniles challenge § 35 on substantive due process grounds, contending that the statute is not narrowly tailored, see Weston W., 455 Mass. at 35, because it permits respondents to be involuntarily committed without supporting clinical evidence.  "We review a challenge to the constitutionality of a statute de novo."  Commonwealth v. Feliz, 481 Mass. 689, 696 (2019), S.C., 486 Mass. 510 (2020).
            "Because civil commitment involves a loss of liberty, a fundamental constitutional right," civil commitment under § 35 is subject to strict scrutiny.  Foster v. Commissioner of Correction (No. 1), 484 Mass. 698, 728, S.C., 484 Mass. 1059 (2020), and 488 Mass. 643 (2021).  Therefore, the statute must be tailored narrowly to serve a compelling governmental interest and be the least restrictive alternative available.  See id.  It is undisputed that § 35 serves the compelling government interest of "promot[ing] the health and safety of the committed individual and others through [substance use disorder] treatment."  Id. at 728-729.  See Matter of a Minor, 484 Mass. at 309 n.9 ("the government has a compelling and legitimate interest in protecting its residents from the often tragic consequences of substance use disorder").  The question then becomes whether the statute is narrowly tailored -- that is, whether commitment and treatment under the statute "promote effectively the government's interest in the individual's and others' health and safety."  Foster, supra at 729.  
            Examining each of the three findings required by § 35 in turn, we determine that the statute is narrowly tailored to its purpose so long as clinical evidence is required to support the first finding, i.e., that the individual has a substance use disorder.  See Edwards v. Commonwealth, 488 Mass. 555, 567 (2021) ("In considering a constitutional challenge to a statute, we have a duty" to construe statutory language to be constitutional).  The other two findings do not require clinical evidence to survive strict scrutiny, as they are well within the scope of judicial knowledge and discretion.[8]  
            i.  Substance use disorder.  Both juveniles contend that, in order to comply with the requirements of substantive due process, a judge's finding that a respondent has a substance use disorder under § 35 must be supported by clinical evidence.  On review, we agree and determine that a finding that a respondent has a substance use disorder under § 35 requires supporting clinical evidence in order to comply with the requirements of substantive due process.
            In opposition, the Attorney General argues in her amicus brief that amendments to § 35, specifically a 2012 amendment, show that the Legislature removed clinical evidence (referred to as "medical testimony" in the statute) as a necessary factor in making this finding.  Prior to 2012, the statute stated:  "If, after a hearing, the court based upon competent medical testimony finds that [a respondent] is an alcoholic or substance abuser," and further finds a likelihood of serious harm, it may order the respondent's commitment (emphasis added).  G. L. c. 123, § 35, as amended through St. 2010, c. 292.  After the statute was amended in 2012, it then stated:  "If, after a hearing and based upon competent testimony, which shall include, but not be limited to, medical testimony, the court finds that [a respondent] is an alcoholic or substance abuser," and further finds a likelihood of serious harm, the court may order a respondent's commitment (emphasis added).  St. 2011, c. 142, § 18 (effective July 1, 2012).  The current version of the statute states:  "If, after a hearing which shall include expert testimony and may include other evidence," the court finds that a respondent has a substance use disorder, and further finds a likelihood of serious harm, the court may order the respondent's commitment (emphasis added).  G. L. c. 123, § 35, as amended through St. 2018, c. 208, §§ 72-74.  
            Reading § 35 to require that clinical evidence support a finding of a substance use disorder does not contradict the Legislature's prior amendments.  The 2012 amendment ensured that the basis for this determination would "not be limited to" clinical evidence alone.   St. 2011, c. 142, § 18.  This amendment broadened the scope of evidence that may be considered in finding that a respondent has a substance use disorder -- it did not "delete[]" clinical evidence as a factor in this determination.  Kenniston v. Department of Youth Servs., 453 Mass. 179, 185 (2009) ("Where the Legislature has deleted such language, apparently purposefully, the current version of the statute cannot be interpreted to include the rejected requirement" [emphasis added]).  See St. 2011, c. 142, § 18.  The 2012 amendment of the statute still mandated that medical testimony "shall" be considered in a commitment hearing and provided that the purpose of commitment was for the respondent to receive inpatient treatment services.  Id.  Therefore, requiring the finding of a substance use disorder under § 35 to be supported by clinical evidence does not negate the Legislature's will.  
            Rather, "[i]t is our duty to give the statute a reasonable construction" that will ensure that § 35 remains narrowly tailored to its dual purposes:  protecting the health and safety of both the public and the respondent (citation omitted).  Commonwealth v. Keefner, 461 Mass. 507, 511 (2012).  See Edwards, 488 Mass. at 567.  See also Foster, 484 Mass. at 729.  To do so, we must recognize that the diagnosis of a substance use disorder "is a clinical determination, not a legal determination."  Supreme Judicial Court, Standards on Substance Use Disorders and Mental Health Conditions, Standard VI commentary, at 17 (Oct. 10, 2023).  A clinical determination requires that a qualified clinician conduct a "diagnostic assessment" over the course of an "in-depth clinical process."  Id.  Because the "purpose" of commitment under § 35 is to provide "inpatient care for the treatment of [the underlying] substance use disorder,"  G. L. c. 123, § 35, it is reasonable to require a clinical diagnosis before a respondent receives such intensive clinical treatment, see 104 Code Mass. Regs. § 27.18(2) (2019); 105 Code Mass. Regs. § 164.005 (2022) (using "substance use disorder" definition from "the current edition of the Diagnostic and Statistical Manual of Mental Disorders" to describe who will be treated by public facility).  See generally Matter of a Minor, 484 Mass. at 308-311 (involuntary commitment of this nature is "carefully circumscribed[] tool of last resort").  Indeed, another portion of § 35 states that the court "shall order [the] examination [of the respondent] by a qualified physician, a qualified psychologist or a qualified social worker" prior to the hearing.  G. L. c. 123, § 35.  Clinical evidence is particularly relevant in a § 35 commitment hearing for a juvenile, where "a judge is required to assess an individual's judgment, self-control, and social functioning, precisely those areas of juvenile brains that are recognized as underdeveloped."  Matter of a Minor, supra at 301.   For all the foregoing reasons, we conclude that the finding of a substance use disorder under § 35 must be, at least in part, supported by clinical evidence.  This requirement helps ensure that § 35 is narrowly tailored to its purpose of protecting the health and safety of both respondents and the public.  See Foster, 484 Mass. at 729.  See also Keefner, 461 Mass. at 511.  See generally Edwards, 488 Mass. at 567 (we interpret statutes to avoid constitutional infirmity). 
            ii.  Likelihood of serious harm.  The second factor weighed under § 35 -- the likelihood of serious harm associated with a respondent's substance use disorder -- need not be supported by clinical evidence.  
            General Laws c. 123, § 1, identifies three types of evidence to weigh in finding a "likelihood of serious harm," as noted supra:  (1) "evidence of, threats of, or attempts at, suicide or serious bodily harm," (2) "evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them," and (3) "evidence that [the respondent's] judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."  See Matter of a Minor, 484 Mass. at 302 (hearing judge in best position to make findings of fact).  
            Assessing the likelihood of serious harm in this context is well within a judge's area of expertise, given that similar assessments have been left to a judge's discretion.  For instance, pursuant to G. L. c. 123, § 8, a judge may involuntarily commit a person found to be mentally ill after also finding that "the discharge of such person from a facility would create a likelihood of serious harm."  See, e.g., Matter of Hernandez, 101 Mass. App. Ct. 856, 861 (2022) (although expert opined that "respondent did not pose an imminent risk of harm," Appeals Court affirmed judge's finding of "likelihood of serious harm," based on respondent's multiple instances of violent behavior, noncompliance with medication, history of substance use, and lack of insight into mental illness).  In another context, a judge may order the pretrial detention of a defendant on the basis of dangerousness if, among other considerations, "no conditions of release will reasonably assure the safety of any other person or the community."  G. L. c. 276, § 58A.  See, e.g., Vega v. Commonwealth, 490 Mass. 226, 238-239 (2022) (affirming pretrial detention on basis of dangerousness, as shown by "live witness testimony and documentary evidence," including "detailed police reports," but not expert testimony).  A judge is similarly well equipped to find a likelihood of serious harm without supporting clinical evidence under § 35.
            iii.  Least restrictive alternative.  Similarly, a finding that no less restrictive alternative exists falls within the realm of a judge's expertise and does not require clinical evidence.  See Matter of a Minor, 484 Mass. at 302 ("hearing judge is in the best position to weigh the evidence" and "make findings of fact").  As we have previously stated, in considering whether involuntary treatment is the least restrictive alternative under § 35, the analysis of alternative treatment options "may," not must, involve the guidance of qualified professionals.  Id. at 310-311.  In evaluating alternatives to civil commitment, judges should consider "the ways in which involuntary commitment can disrupt ongoing treatment efforts," as well as social relationships -- not necessarily clinical evidence.  Id. at 310.  Further, as with the finding of a likelihood of serious harm, other sections of G. L. c. 123 leave the determination of whether commitment is the least restrictive alternative up to the judge.  See generally Commonwealth v. Nassar, 380 Mass. 908, 918 (1980) (least restrictive alternative determination under G. L. c. 123 "is for the judge in the first instance" and "in [the judge's] discretion").  For example, under G. L. c. 123, § 15 (b), which allows for involuntary commitment by reason of mental illness, the Commonwealth may demonstrate that no less restrictive alternative is available through "expert opinion testimony" or, in the alternative, "other types of evidence."  Commonwealth v. A.Z., 493 Mass. 427, 432-433 (2024) ("other" evidence may include respondent's failures to comply with outpatient services or lack of "plausibly available" alternatives).  Therefore, a finding of whether less restrictive alternatives exist does not require clinical evidence.  
            c.  "Chronic or habitual" use.  The juveniles also claim that § 35 is void for vagueness because the statutory definition of a substance use disorder hinges on the "chronic or habitual" use of controlled substances.  In her amicus brief, the Attorney General counters that "chronic or habitual consumption" is explained within the statute -- that is, a respondent's substance use is chronic or habitual "to the extent that" it either "substantially injures the [respondent's] health," "substantially interferes with the [respondent's] social or economic functioning," or results in the respondent having "lost the power of self-control over the use of such controlled substances."  G. L. c. 123, § 35.  We agree with the Attorney General that the terms "chronic" and "habitual," to the extent they define substance use disorders within § 35, are sufficiently clear and are not void for vagueness.  
            "A law is void for vagueness if persons of common intelligence must necessarily guess at its meaning and differ as to its application . . . or if it subjects people to an unascertainable standard."  Commonwealth v. Cassidy, 479 Mass. 527, 538, cert. denied, 139 S. Ct. 276 (2018), quoting Chief of Police of Worcester v. Holden, 470 Mass. 845, 854 (2015).  However, "[e]ven in the criminal context . . . statutes do not contravene constitutional requirements [or become void for vagueness] simply because they include general terms."  Custody of a Minor, 378 Mass. 712, 717 (1979).
            By the plain language of § 35, the Legislature has provided three metrics to aid in assessing whether substance use is "chronic or habitual":  the respondent's health, the respondent's social or economic functioning, and the respondent's level of self-control.  In this way, a judge may assess whether substance use is "chronic or habitual" by focusing on the impact the substance use has on the respondent's life across these three factors.  G. L. c. 123, § 35.  The words "chronic" and "habitual" add further meaning in their own right, in that the impact of substance use on a respondent's life should be considered over time, rather than in isolated instances.  See Merriam-Webster's Collegiate Dictionary 221, 559 (11th ed. 2020) (defining "chronic" as "long duration or frequent recurrence" and "habitual" as "force of habit").  See also Boone v. Commerce Ins. Co., 451 Mass. 192, 196 (2008) ("A general principle of statutory interpretation" is that every word should be imbued with meaning and "no word is considered superfluous").  
            Together with the three metrics provided by statute to gauge the impact of substance use on a respondent's life, the Legislature's use of "chronic" and "habitual" in the definition of a substance use disorder does not impose an unascertainable standard.  See Cassidy, 479 Mass. at 538, quoting Holden, 470 Mass. at 854 ("A law is void for vagueness . . . if it subjects people to an unascertainable standard").  While there might be differences in opinion as to the extent that substance use impacts a given respondent's health, social functioning, or self-control, the statute provides sufficient explanation of the terms "chronic" and "habitual" for a judge to determine, with the aid of clinical evidence, whether a respondent suffers from a substance use disorder under G. L. c. 123, § 35.  Cf. Commonwealth v. Donoghue, 4 Mass. App. Ct. 752, 755-757 (1976) (G. L. c. 94, § 210A, which required medical personnel to report every person "suffering from the chronic use of narcotic drugs," void for vagueness because definition of "chronic" not provided in statute and therefore "[too] much latitude" in different definitions of word).  
            d.  Sufficiency of the evidence.  We next consider whether the evidence was sufficient to justify the commitment orders for the two juveniles, E.S. and J.P.  
            i.  Standard of review.  Where the sufficiency of the evidence at an evidentiary hearing is challenged, we "scrutinize without deference the propriety of the legal criteria employed by the [motion] judge and the manner in which those criteria were applied to the facts."  Matter of a Minor, 484 Mass. at 302, quoting Matter of A.M., 94 Mass. App. Ct. 399, 401 (2018).  
            ii.  E.S.  After hearing the testimony of the court clinician and E.S.'s parents, the judge ordered the commitment of E.S. for ninety days.  In so doing, she laid out the factual bases underlying her decision, see Matter of a Minor, 484 Mass. at 307, and did not err in finding the conditions to commit E.S. under § 35 had been met.  
            In finding that E.S. had a substance use disorder, the judge relied on the testimony of the clinician and E.S.'s parents.  When discussing which controlled substances E.S. used, the judge credited her parents' testimony that "[E.S.] has abused alcohol" and engaged in "cannabis use on a daily basis."  She further credited their testimony that "wine bottles, nips and marijuana," "rolled up dollar bills" and "empty [pill] containers" on trays had been found in both of their homes.  In particular, the judge highlighted E.S.'s multiple positive test results for fentanyl over the past month.  The judge did not cabin her review of E.S.'s substance use to the weeks leading up to the § 35 civil commitment petition.  See G. L. c. 123, § 35 (substance use disorder defined by chronic or habitual consumption).  Rather, she found that E.S. had "a longstanding issue with . . . substances" that had begun years before with her parents' separation.  The judge described "multiple incidents where both parents ha[d] observed her to be highly under the influence" over recent months, including moments when E.S. had fallen "dead asleep with her head hanging," "stumble[d] down the school stairs," and "nodd[ed] off."  See id. (substance use disorder defined by use that substantially injures person's health or interferes with social functioning).  With these incidents in mind, the judge feared that E.S.'s substance use would result in injury, specifically stating that "if [E.S] didn't have parental supervision[,] this would be a very, very, very risky situation."  Based on this testimony, together with evidence of E.S.'s two prior hospitalizations for suicidal ideation, the judge found that E.S. "ha[d] a dual-diagnosis" and that the standard of finding by clear and convincing evidence that E.S. has a substance use disorder "ha[d] been met."  Because the judge's determination appropriately was supported by clinical evidence, in addition to testimony from E.S.'s parents, the judge did not clearly err in finding that E.S. had a substance use disorder.  See Matter of a Minor, 484 Mass. at 304 (finding substance use disorder "based on . . . treatment history and continuing drug use" not clearly erroneous even though "not beyond dispute" based on record).
            The judge further found that E.S.'s substance use created a likelihood of serious harm -- more specifically, a risk of injury to E.S.  The judge reasoned that this risk was made imminent by the "extremely toxic" nature of fentanyl, combined with the lack of any outpatient care programs with immediate availability.  See Matter of a Minor, 484 Mass. at 305, citing Matter of C.R., 2019 Mass. App. Div. 111, No. 19-ADMH-48SO (Dist. Ct. Sept. 25, 2019) (commitment appropriate where evidence supported respondent using substances known to be "fatal").  See also Commonwealth v. Carrillo, 483 Mass. 269, 283 n.8 (2019) (among 1,902 opioid-related overdose deaths in 2018 where toxicology screen available, eighty-nine percent had positive result for fentanyl).  The judge "did not specify which of the three disjunctive definitions she used in finding a likelihood of serious harm."  Matter of a Minor, supra at 304.  However, she reasoned that "[i]f [E.S.] ran into a situation, as she did [days before] where she was unable to walk, unable to talk, unable to maneuver stairs, she could have become seriously harmed" as a result of her intoxication.  See G. L. c. 123, § 1 (likelihood of serious harm defined as "very substantial risk of physical impairment or injury").  This risk was compounded by the fact that E.S. had just "taken off for four days, [where] nobody [knew] where she was, [and] nobody [knew] if or what [substances] she was using."  The judge found that this pattern of behavior is not "normal adolescent behavior" -- rather, echoing G. L. c. 123, § 1, the judge concluded that E.S.'s substance use posed "a very imminent and very substantial risk of physical impairment or injury" to her.  Although the court clinician testified that E.S. "[does not] meet the dangerousness prong for sure," the judge did not err in finding a likelihood of serious harm, particularly given the nature of the substance involved.  
            In finding no less restrictive alternative available, the judge explained, based on the court clinician's testimony that there was a two-week waiting list for intensive outpatient care programs, that there was "nothing in the community right now that could meet [E.S.'s] level of needs."  Although E.S. attended a recovery high school, the judge reasoned that "all of us would agree that [E.S.] needs [intensive outpatient care] in order to maintain her sobriety."  She considered E.S.'s "status as a youth" in making this assessment, together with E.S.'s strong preference to avoid going to an inpatient facility.  Because the judge considered all viable alternatives and found none presently available, see Matter of a Minor, 484 Mass. at 310, the judge did not err in finding that no less restrictive options were available to E.S.
            In sum, the evidence before the judge was sufficient to justify the order to involuntarily commit E.S. under § 35.  
            iii.  J.P.  Unlike in the case of E.S., the evidence was insufficient to support the involuntary commitment of J.P. under § 35.  See Matter of a Minor, 484 Mass. at 307 (finding "likelihood of serious harm stemming from [substance use] disorder" requires judge "make clear" supporting evidence).  
            We focus our analysis on the judge's finding that J.P.'s marijuana use caused a likelihood of serious harm "to himself."  See Matter of a Minor, 484 Mass. at 306.  Under G. L. c. 123, § 1, a respondent can manifest a likelihood of serious harm to himself through either (1) "threats of, or attempts at, suicide or serious bodily harm" or (2) a "very substantial" risk of physical injury due to impaired judgment.  To the first avenue, J.P. did not manifest any signs of attempting self-harm; in fact, the clinician testified that "his mental status was good."  
            To the second avenue, there was evidence that J.P. drove a car while under the influence of marijuana on at least one occasion, posing a risk of physical injury to himself and others.  But there was only evidence that J.P. drove high the one time.  While we are sympathetic to the sincere concern that motivated this petition, and while J.P. "possibly" may have driven high on other occasions (according to both the court clinician and his mother's "belie[f]"), as the clinician acknowledged, "we don't have [any] evidence of it" in the record.  The "mere possibility" that J.P. might drive high again "does not rise to the level of an imminent and 'very substantial risk of physical impairment or injury'" necessary to justify involuntary commitment.  Matter of a Minor, 484 Mass. at 305, quoting G. L. c. 123, § 1.  "Without a [clear] nexus to the likelihood of serious harm resulting from a substance use disorder," this incident "cannot support a petition for commitment under [§ 35]."  Matter of a Minor, supra at 301.  Moreover, when explicitly asked, the court clinician "did not find that [J.P.] is a danger to himself or others because of his substance use."  Given the fundamental liberty interest at stake here, the facts are insufficient to support the involuntary commitment of J.P.  See id. at 309.
            3.  Conclusion.  Ultimately, we conclude that § 35 survives the juveniles' due process challenges.  In determining whether an individual has a substance use disorder for the purposes § 35, a judge's finding must be supported by clinical evidence.  In determining whether a likelihood of serious harm or a less restrictive alternative exists, a judge's finding need not be supported by clinical evidence.  As to E.S., the order of commitment is affirmed.  As to J.P., the finding of a likelihood of serious harm "must be reversed, and the order of commitment must be vacated and set aside.  The matter is remanded to the Juvenile Court for entry of an order consistent with this opinion."  Matter of Minor, 484 Mass. at 311.
So ordered.  
 
footnotes

 
            [1] We acknowledge the amicus briefs submitted by the Attorney General; and the Committee for Public Counsel Services and Citizens for Juvenile Justice.
            [2] A recovery high school is "a school specially designed for youth with substance use disorders."  Matter of a Minor, 484 Mass. at 298.
            [3] The judge credited E.S.'s later claim that the sample came from another student.
            [4] The clinician testified that E.S. had never overdosed.
            [5] At the time of her commitment, E.S. was sixteen years old.  E.S. was discharged on May 3, 2023.  "Because individuals committed under [§ 35] have a personal stake in litigating a wrongful commitment, even after release from confinement," E.S.'s appeal from her order of commitment under § 35 is "not moot."  Matter of a Minor, 484 Mass. at 299-300.
            [6] To "feen," also spelled "fiend," is slang for "to desire greatly."  https://www.dictionary.com/browse/fiend [https:
//perma.cc/66XV-6XYW].
            [7] At the time of his commitment, J.P. was sixteen years old.  He was discharged on May 19, 2023.  For the same reasons explained in note 5, supra, his appeal is not moot.  See Matter of a Minor, 484 Mass. at 299-300.
            [8] That is not to say that a judge should avoid considering clinical evidence when offered on these points.  Judges must weigh seriously the testimony of any qualified expert who opines on a respondent's likelihood of serious harm or on the existence of less restrictive alternatives.